DOC No. 317225

KC **FILED**

4353-2/-54*-710

DEC 0 6 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DEC 0 5 2007

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CAMICO MUTUAL INSURANCE COMPANY, )
a California corporation, individually and )
as subrogee of Richard L. Hawkins and )
RICHARD L. HAWKINS, individually, )
                                    )       Case No.:
            Plaintiffs, )
                                      )
      v. )       **JURY TRIAL DEMANDED**
                                      )
ARTHUR ANDERSEN, LLP, an Illinois limited )   **07CV6861**
liability partnership, )   **JUDGE GUZMAN**
                                      )   **MAGISTRATE JUDGE MASON**
           Defendant. )

## COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Now come Plaintiffs, CAMICO Mutual Insurance Company ("CAMICO"), a California

corporation, individually and as subrogee of Richard L. Hawkins, and Richard L. Hawkins

("Hawkins"), an individual, (CAMICO and Hawkins herein shall be referred to as "Plaintiffs"),

and for their Complaint for Declaratory and Other Relief against Defendant Arthur Andersen,

LLP, allege as follows:

**I.**     **NATURE OF ACTION AND RELIEF SOUGHT**

     1.      This action seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and

other legal and equitable relief.

     2.      The Plaintiffs seek a declaration that Arthur Andersen has a duty to defend and

indemnify Hawkins under certain Termination Agreements (defined and discussed herein) based

on the allegations and claims contained in a lawsuit styled <u>Synectic Ventures, LLC, et al. v.

Craig L. Berkman, et al.</u>, Case No. 0512-13245 (Circuit Court of the State of Oregon,

Multnomah County) ("<u>Synectic</u> action").

3.      Plaintiffs, additionally, seek a ruling that Arthur Andersen, in refusing to defend Hawkins in the Synectic action, has breached its duties and obligations under the Termination Agreements.

4.      CAMICO also seeks reimbursement, or alternatively contribution, from Arthur Andersen for its refusal to pay any attorneys' fees, costs and/or expenses on behalf of Hawkins in the Synectic action. To date, Hawkins has incurred $386,000 in attorneys' fees, costs and expenses in defending himself in the Synectic action, $174,000 of which CAMICO has paid under an accountant professional liability policy issued to Geffen, Mesher & Company, P.C., Hawkins' subsequent employer. In having paid fees, costs and expenses in defending Hawkins in the face of allegations triggering Arthur Andersen's duties and obligations under the Termination Agreements, CAMICO is contractually and equitably subrogated to Hawkins' rights to seek reimbursement from Arthur Andersen.

## II.    THE PARTIES

5.      CAMICO is a mutual liability insurance company organized and existing under the laws of the State of California. CAMICO's principal place of business is in Redwood City, California.

6.      Arthur Andersen, LLP is an Illinois limited liability partnership with its principal place of business being Chicago, Illinois. At all relevant times herein, Arthur Andersen was authorized to do business, and was actually doing business, in Illinois.

7.      Richard L. Hawkins has been, and is, an individual who resides and conducts business as a certified public accountant in the State of Oregon.

III.    **JURISDICTION AND VENUE**

8.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties, and because the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (c).

IV.     **BACKGROUND**

A.      **Hawkins' Employment and Termination With Arthur Andersen**

10.     From 1995 until July, 2001, the accountancy firm of Arthur Andersen employed Hawkins.

11.     For all or a portion of his tenure with Arthur Andersen, Hawkins provided professional and accounting services to certain venture capital investment funds known as Synectic Ventures I, LLC, Synectic Ventures II, LLC and Synectic Ventures III, LLC (collectively the "Funds"). While performing such services, Hawkins worked directly with the Funds' owner, director, officer and/or agent Craig L. Berkman.

12.     On or about July 31, 2001, Hawkins terminated his employment with Arthur Andersen.

13.     By agreement dated July 26, 2001, Arthur Andersen agreed to defend, indemnify and protect Hawkins with respect to any malpractice litigation arising out of work performed in connection with his obligations and responsibilities as a partner of Arthur Andersen. See, Ex. 1, Letter dated July 26, 2001 ("AA agreement").

14.     Arthur Andersen also agreed to defend Hawkins for any claim against Hawkins arising out of his activities while a partner at Arthur Andersen and undertaken in accordance with his fiduciary responsibilities. See, Ex. 2, Determination of Richard L. Hawkins Interest

Upon the Effective Date of Retirement ("Determination"). Herein, the AA agreement and the Determination shall be collectively referred to as "Termination Agreements."

15.    Upon information and belief, Arthur Andersen procured insurance policies, the purpose and provisions of which would provide coverage for defense and indemnity to Hawkins in connection with his activities while a partner at Arthur Andersen. See, Ex. 1.

16.    In the event Arthur Andersen failed to procure such insurance, Arthur Andersen is now responsible for all obligations under such policies.

17.    On August 1, 2001, Hawkins became a shareholder in the Geffen Mesher & Company, P.C.

**B.    The CAMICO Policy Issued to Geffen Mesher & Company, P.C.**

18.    CAMICO issued a "claims-made and reported," Accountants Professional Liability Insurance Policy, number ORL00736-03, to Geffen, Mesher & Company, P.C. ("CAMICO policy") with an effective date of November 26, 2004 to November 26, 2005. The CAMICO policy provides a $5 million Per *Claim* and Aggregate Limit of Liability, and contains a $25,000 Per *Claim* Deductible. See, Ex. 3, the CAMICO policy.

19.    Hawkins qualifies as an *Insured* under the CAMICO policy, but only for claims arising from Hawkins' "negligent acts, errors or omissions in rendering or failing to render *Professional Services*" on behalf of Geffen, Mesher & Company, P.C.

20.    The CAMICO policy states in relevant part:

    **C.    Transfer and Assignment of *Insured's* Rights and Duties**

        *        *        *

        2.    If [CAMICO] makes any payment for *Damages* and/or *Claim Expenses*, it shall be subrogated to all of the *Insured's* rights of recovery against anyone, and the *Insured* shall do whatever is necessary to secure such rights. After becoming aware of a *Claim*

4

or *Potential Claim*, no *Insured* shall do anything to prejudice the Company's subrogation rights.

See, Ex. 3, pg. 8, Section C.

21.     The CAMICO policy defines *"Claims Expenses"* as:

\*          \*          \*

(d)     *Claim Expenses* are the fees charged by an attorney designated by [CAMICO] to defend any *Insured*, and all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a *Claim*, if incurred by [CAMICO] of by an *Insured* at [CAMICO's] request....

See, Ex. 3, pg. 1, ¶ 1(d).

### C.     The Synectic Action

22.     On December 20, 2005, the Funds and seventy-one investors in the Funds filed the Synectic action naming Craig L. Berkman, Hawkins, Arthur Andersen and Geffen, Mesher & Company, P.C. as defendants. See, Ex. 4, the Third Amended Complaint filed in the Synectic action.

23.     The plaintiffs in the Synectic action allege accounting malpractice and negligent misrepresentation claims against Hawkins arising out of professional services rendered to the Funds while Hawkins was employed at Arthur Andersen and continuing while employed at Geffen Mesher & Company, P.C.

24.     The Synectic complaint specifically alleges that Hawkins acquired knowledge of Berkman's misconduct while Hawkins was performing services for the Funds as a partner at Arthur Andersen, and, subsequently, at Geffen, Mesher & Company, P.C.

25.     The Synectic action also alleges that Hawkins, while a partner at Arthur Andersen, failed to, among other things: investigate the illegality of Berkman's acts; inform the appropriate level of Fund management regarding the material errors, fraud or illegal acts; and

5

disclose to the Fund and/or its members accounting errors, misstatements and/or misrepresentations made by Berkman.

**D.    Hawkins Tender to Arthur Andersen and CAMICO**

26.    Hawkins tendered the Synectic action to Arthur Andersen, and requested that Arthur Andersen acknowledge its obligations to defend and indemnify him under the terms of the Termination Agreements.

27.    Arthur Andersen declined Hawkins' tender.

28.    Arthur Andersen has failed to defend Hawkins in the Synectic action.

29.    Arthur Andersen has not paid any costs, fees or expenses incurred in defending Hawkins in the Synectic action.

30.    Arthur Andersen is also a defendant in the Synectic action for its alleged vicarious liability stemming from Hawkins' professional services rendered while Hawkins was employed at Arthur Andersen.

31.    Arthur Andersen has retained counsel, and is defending itself in the Synectic action.

32.    Rather than defend Hawkins in his individual capacity, Arthur Andersen has offered to defend Hawkins through counsel currently representing Arthur Andersen in the Synectic action, provided that Hawkins waive all conflicts that may arise from their concurrent representation. Hawkins refused to execute such a waiver, and has maintained his demand that Arthur Andersen defend and indemnify him individually in the Synectic action pursuant to the terms and conditions of the Termination Agreements.

33.    Hawkins also tendered the defense of the Synectic action to CAMICO requesting that CAMICO defend him in the Synectic action.

34.    CAMICO accepted Hawkins tender of defense, subject to a reservation of rights, and is currently defending Hawkins in the Synectic action.

**E.    Amounts Incurred and Paid to Date in the Defense of Hawkins**

35.    As a result of Arthur Andersen's wrongful refusal to defend and indemnify Hawkins, CAMICO has incurred substantial loss, including but not limited to the payment of costs, experts and attorneys' fees for the defense of Hawkins in the Synectic action. To date, defense fees and litigation costs for Hawkins in the Synectic action exceed $386,000. Additional defense costs will be incurred going forward.

36.    To date, CAMICO has paid $174,000 in attorneys' fees, costs and litigation expenses in defending Hawkins in the Synectic action.

37.    CAMICO has a subrogated interest and is equitably and contractually subrogated to Hawkins' right to enforce the terms and conditions of the Termination Agreements.

**COUNT I**

**DECLARATORY JUDGMENT – ARTHUR ANDERSEN'S DUTY TO DEFEND AND INDEMNFY HAWKINS IN THE SYNECTIC ACTION**

38.    Plaintiffs incorporates Paragraphs 1-37 as if fully set forth herein.

39.    The Termination Agreements contractually obligate Arthur Andersen to defend, and ultimately indemnify, Hawkins for allegations of professional negligence committed while employed by, and in his professional capacity with, Arthur Andersen.

40.    The Synectic complaint alleges accounting malpractice and negligent misrepresentation claims against Hawkins arising out of professional services rendered by Hawkins while a partner at Arthur Andersen. (See, Ex. 4).

41.    The claims asserted in the Synectic action trigger Arthur Andersen's duty to defend and indemnify Hawkins under the Termination Agreements.

42. Plaintiffs are entitled to a judicial declaration that: (1) Arthur Andersen is obligated to defend Hawkins in the Synectic action; (2) Arthur Andersen has an obligation to reimburse CAMICO for the defense costs and litigation expenses paid in defending Hawkins in the Synectic action; (3) that Arthur Andersen has an ongoing obligation to pay defense costs and fees incurred in defending Hawkins in the Synectic action; and (4) Arthur Andersen has an obligation to indemnify Hawkins for any amount awarded to the plaintiffs in the Synectic action with respect to Hawkins' activities while employed at Arthur Andersen.

43. Pursuant to 28 U.S.C.A. §§ 2201-2202. Plaintiffs are entitled to a declaratory judgment concerning the rights and liabilities of Arthur Andersen under the Termination Agreements.

**WHEREFORE**, CAMICO MUTUAL INSURANCE COMPANY and RICHARD L. HAWKINS respectfully request that judgment be entered in their favor and against ARTHUR ANDERSEN, LLP, as follows:

A. Declaring that Arthur Andersen has, and had from the date of Hawkins' tender to Arthur Andersen, a duty to defend Richard L. Hawkins in the Synectic action;

B. Declaring that Arthur Andersen is obligated for all or a part of Hawkins' defense costs and litigation expenses in the Synectic action on a going-forward basis;

C. Awarding Plaintiffs their costs for this suit; and

D. Awarding Plaintiffs such other and further relief as the Court deems just and proper.

## COUNT II

## BREACH OF CONTRACT

44. The Plaintiffs incorporate paragraphs 1-37 as if fully set forth herein.

45.    Under the Termination Agreements, Arthur Andersen agreed to defend, indemnify and protect Hawkins in connection with any malpractice litigation arising out of work performed in connection with his obligations and responsibilities as a partner of Arthur Andersen, and undertaken in accordance with his fiduciary responsibilities. See, Exs. 1 & 2.

46.    The Synectic complaint alleges accounting malpractice and negligent misrepresentation claims against Hawkins arising out of professional services rendered by Hawkins while employed at Arthur Andersen.

47.    Hawkins tendered the Synectic action to Arthur Andersen requesting that Arthur Andersen defend and indemnify Hawkins in accordance with its duties and obligations under the Termination Agreements.

48.    Arthur Andersen has refused to defend Hawkins in the Synectic action.

49.    In failing to defend Hawkins in the Synectic action, Arthur Andersen has breached its contractual obligations under the Termination Agreements.

50.    Hawkins has incurred fees, costs and expenses in defending himself in the Synectic action.

51.    CAMICO has paid attorneys' fees, costs and litigation expenses to defend Hawkins in the Synectic action. In having paid defense costs and litigation expenses to defend Hawkins, CAMICO is subrogated to Hawkins' rights and may enforce the terms of the Termination Agreements.

**WHEREFORE**, CAMICO MUTUAL INSURANCE COMPANY and RICHARD L. HAWKINS request that judgment be entered in their favor and against ARTHUR ANDERSEN, LLP, as follows:

A.      That Arthur Andersen has breached its duties and obligations under the Termination Agreements to Hawkins in connection with the Synectic action;

B.      That Arthur Andersen must reimburse CAMICO all amounts CAMICO has paid to date in defense of Hawkins in the Synectic action;

C.      That Arthur Andersen must pay all amounts, past, present and future, incurred in defending Hawkins in the Synectic action, which have not been paid by CAMICO;

D.      That Arthur Andersen must pay all other reasonable and foreseeable damages that are a consequence of its breach of the Termination Agreements;

E.      Awarding the Plaintiffs their costs for this suit; and

F.      Awarding the Plaintiffs such other and further relief as the Court deems just.

## COUNT III

## CONTRACTUAL SUBROGATION – REIMBURSEMENT OF DEFENSE COSTS

52.     CAMICO incorporates Paragraphs 1-37 as if fully set forth herein.

53.     The CAMICO policy provides, "[I]f [CAMICO] makes any payment for *Damages* and/or *Claim Expenses*, it shall be subrogated to all of the *Insured's* rights of recovery against anyone, and the *Insured* shall do whatever is necessary to secure such rights...." See, Ex. 3.

54.     The claims asserted in the Synectic action trigger Arthur Andersen's duty to defend and indemnify Hawkins insofar as the Synectic complaint alleges accounting malpractice and negligent misrepresentation claims against Hawkins arising out of professional services rendered by Hawkins while a partner at Arthur Andersen.

55.     Arthur Andersen has failed to defend Hawkins in the Synectic action.

56.     CAMICO has agreed to defend Hawkins in the Synectic action, and has, to date, paid $174,000 in fees, costs and expenses in defending Hawkins.

10

57.     CAMICO has paid, at least in part, amounts that are equally, if not altogether, the responsibility of Arthur Anderson.

58.     CAMICO is contractually subrogated to Hawkins' right to enforce the terms and conditions of the Termination Agreements.

59.     CAMICO is entitled to recover from Arthur Andersen those past and present fees, costs and expenses incurred in defending Hawkins in the Synectic action, which it has paid.

**WHEREFORE**, CAMICO MUTUAL INSURANCE COMPANY requests that judgment be entered in its favor and against ARTHUR ANDERSEN, LLP, as follows:

A.     Declaring that Arthur Andersen must reimburse CAMICO $174,000 for those past fees, costs and expenses paid by CAMICO in defending Hawkins;

B.     For prejudgment interest on the liquidated amount paid by CAMICO;

C.     Awarding CAMICO its costs for this suit; and

D.     Awarding CAMICO such other and further relief as the Court deems just.

## COUNT IV

## EQUITABLE SUBROGATION – REIMBURSEMENT OF DEFENSE COSTS

60.     CAMICO incorporates Paragraphs 1-37 as if fully set forth herein.

61.     The claims asserted in the Synectic action trigger Arthur Andersen's duty to defend and indemnify Hawkins insofar as the Synectic complaint alleges accounting malpractice and negligent misrepresentation claims against Hawkins arising out of professional services rendered by Hawkins while a partner at Arthur Andersen.

62.     Arthur Andersen has failed to defend Hawkins in the Synectic action.

63.     CAMICO has agreed to defend Hawkins in the Synectic action, and has, to date, paid $174,000 of fees, costs and expenses incurred in defending Hawkins.

11

64.    CAMICO has paid, at least in part, amounts that are equally, if not altogether, the responsibility of Arthur Anderson.

65.    CAMICO is equitably subrogated to Hawkins' right to enforce the terms and conditions of the Termination Agreements.

66.    CAMICO is entitled to recover from Arthur Andersen those past and present fees, costs and expenses incurred in the defense of Hawkins in the Synectic action, which it has paid.

**WHEREFORE,** CAMICO MUTUAL INSURANCE COMPANY requests that judgment be entered in its favor and against ARTHUR ANDERSEN, LLP, as follows:

A.    Declaring that Arthur Andersen must reimburse CAMICO $174,000 for those past defense costs and litigation expenses paid by CAMICO in defense of Hawkins;

B.    For prejudgment interest on the liquidated amount paid by CAMICO;

C.    Awarding CAMICO its costs for this suit; and

D.    Awarding CAMICO such other and further relief as the Court deems just.

## COUNT V

### ALTERNATIVE COUNT, EQUITABLE CONTRIBUTION

67.    CAMICO incorporates Paragraphs 1-37 as if fully set forth herein.

68.    Under the Termination Agreements, Arthur Andersen agreed to defend and indemnify Hawkins in connection with any malpractice litigation arising out of work performed by Hawkins in connection with his obligations and responsibilities as a partner of Arthur Andersen.

69.    CAMICO agree to defend and indemnify Hawkins for Claims arising from an *Insured's* negligent acts, errors or omissions in rendering or failing to render *Professional Services* on behalf of Geffen, Mesher & Company, P.C.

12

70.    The allegations and claims set forth in the Synectic complaint trigger both Arthur Andersen's and CAMICO's duties to defend Hawkins.

71.    Arthur Andersen has failed to defend Hawkins in the Synectic action.

72.    CAMICO, to date, has paid $174,000 of Hawkins' incurred defense costs and litigation expenses in the Synectic action.

73.    In having paid more than its *pro rata* share of defense costs and litigation expenses on behalf of a mutual insured, CAMICO is entitled to contribution from Arthur Andersen of its *pro rata* share of those fees, costs and expenses incurred in defending Hawkins.

**WHEREFORE**, CAMICO MUTUAL INSURANCE COMPANY requests that judgment be entered in its favor and against ARTHUR ANDERSEN, LLP, as follows:

A.    Declaring that Arthur Andersen must pay its *pro rata* share of those fees, costs and expenses incurred in defending Hawkins' in the Synectic action;

B.    Declaring that Arthur Andersen has an ongoing obligation to share defense costs and fees incurred to defend Hawkins in the Synectic action;

C.    Awarding CAMICO its costs for this suit; and

D.    Awarding CAMICO such other and further relief as the Court deems just.

In addition, CAMICO Mutual Insurance Company and Richard L. Hawkins demand a jury trial as to all matters triable as a matter of right to a jury.

Dated:  December 5, 2007                    CAMICO Mutual Insurance Company and
                                            Richard L. Hawkins


                                            By: _____
                                                 One of their Attorneys

D.J. Sartorio
Donald E. Elder
TRESSLER, SODERSTROM, MALONEY & PRIESS, LLP

233 South Wacker Dr.
Sears Tower, 22nd Floor
Chicago, Illinois 60606
(312) 627-4000
www.tsmp.com

# EXHIBIT 1

Jack G Wilborn
Managing Partner
Portland

jack.g.wilborn@us.arthurandersen.com

**ARTHURANDERSEN** 

Richard L. Hawkins
3869 SW Jerald Court
Portland, OR 97221

**Arthur Andersen LLP**

Suite 1500
111 SW Columbia Street
Portland OR 97201

Tel 503 220 6048
Fax 503 220 8900

www.arthurandersen.com

July 26, 2001

Dear Rick:

In connection with the execution of your determination statement, you will be providing a general release in favor of the Firm. The release is not mutual since the Firm's partnership agreement, and its professional indemnity insurance arrangements (not to mention the Firm's financial strength which must be maintained by the continuing partners), provide substantial protection to a former partner. Also, it is the Firm's policy to provide the defense of litigation involving the Firm or its personnel who have acted in accordance with their obligations to the Firm.

Specifically, Article 9(D) relieves the former partner of any obligation to share in net losses suffered by the Firm following the date of the partner's departure. These losses, even if arising out of events occurring prior to the partner's departure, must be borne by the continuing partners.

Further, the Firm's professional indemnity insurance extends coverage to former partners individually in respect of activities occurring prior to their departure even if a claim is only made subsequent to the departure date. As a practical matter this means that former partners enjoy the same coverage as continuing partners under our policy which is a "claims made" policy.

The Firm's financial strength (including maintenance of the substantial amount of proforma capital which has not been allocated but retained to cover uninsured risks) is, of course, the responsibility of the continuing partner.

It is the Firm's policy to defend malpractice litigation against it or its personnel in connection with the Firm engagements. In that regard, the Firm continues to provide former partners with the Firm's counsel (and bears the cost of such counsel) in the event the former partner's participation is needed in the defense of a claim against the Firm or the partner. Our policy assumes that the activities of the former partner while with the Firm were undertaken in compliance with the Firm's policies and practice standards and for the benefit of the Firm.

Finally, as part of your determination statement which reflects the adjustments you have reached with the Firm, the release does not extend to whatever relationships of a purely personal nature, and not involving the Firm's business or activities on behalf of the Firm, you may have with other individuals who also happen to be Firm personnel. The Firm is not authorized to act on behalf of its personnel in matters unrelated to the Firm, and the release does not purport to do so.

Sincerely,

Jack G. Wilborn

Copies:
Sharon A. McFadden, Chicago-33W

# EXHIBIT 2

Determination of Richard L. Hawkins Interest
Upon the Effective Date of Retirement
July 31, 2001
Page Two of Two

IN WITNESS WHEREOF, the following designated representative of the Firm has hereunto set his hand and seal this _____ day of _____, 2001.

_____
Dennis R. Reigle

I accept the foregoing determinations payable to me as full and complete satisfaction of all of my interest in Arthur Andersen LLP, an Illinois Partnership, AA Holdings CV, a Dutch Limited Partnership, Andersen Worldwide Societe Cooperative and any affiliated firms (including any inventions, writings or other intellectual property created by me or under my supervision as part of and during my association with any of the foregoing firms).

In consideration of payment to me of the determined amounts, including the sum of $10, and on the understanding that Arthur Andersen LLP will defend any claim against me involving my activities while a Partner on its behalf undertaken in accordance with my fiduciary responsibilities thereto, I unconditionally release each of the foregoing firms (and their respective personnel) from any claims (whether or not known).

I intend this general release to be binding on my successors and I specifically (i) waive any applicable law (and confirm that I have no claim under any law providing rights to employees) and (ii) agree not to file or continue any claim in respect of matters covered by this release.

I reaffirm my intention to comply with continuing obligations under Arthur Andersen LLP's organizational document(s), as presently in effect, binding on former Partners and Directors including restrictions on future activities, except as provided for in the July 2001 letter from Terry Hatchett attached hereto.

SIGNED this __30th__ day of __July__, 2001.

_____
Richard L. Hawkins

hawkins2final.rtf 07/25/01 4:04 PM

RLH000494

# EXHIBIT 3



# CAMICO®
### MUTUAL INSURANCE COMPANY

## DECLARATIONS

### ACCOUNTANTS PROFESSIONAL LIABILITY INSURANCE POLICY

Policy Number:   ORL00736-03

| | | |
|---|---|---|
| Effective Date: | 11/26/2004 | at 12:01 A.M. Standard time at the address shown below |
| Expiration Date: | 11/26/2005 | at 12:01 A.M. Standard time at the address shown below |
| Retroactive Date: | 11/26/1990 | |

**Item 1 - Named Insured:** Geffen, Mesher & Company, P.C.

**Item 2 - Business Address:** 888 S.W. Fifth Avenue, Suite 800

Portland, OR 97204

| | | |
|---|---|---|
| **Item 3 - Limits of Liability:** | $5,000,000 | Per Claim |
| | $5,000,000 | Policy Aggregate |
| **Item 4 - Deductibles:** | $25,000 | Per Claim Deductible |

**Item 5 - Total Premium:** $79,393

Item 6 - The policy consists of this Declarations page, and the following policy forms and endorsements:

| | |
|---|---|
| PL-1000-A | Accountants Professional Liability Insurance Policy |
| PL-2018-A (OR) | State Endorsement - Oregon |
| PL-1005-A | Employment Practices Defense Endorsement |
| PL-1007-A | Exclusion - Claims Following Insured's Suit for Fees |
| PL-1002-A | Additional Named Insured Endorsement |

NOTICE OF TERRORISM INSURANCE COVERAGE: Coverage for acts of terrorism as defined under the Terrorism Risk Insurance Act of 2002 ("TRIA") is already included in your current policy. You should know that, effective November 26, 2002, under your existing coverage, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by CAMICO Mutual Insurance Company. The portion of your annual premium that is attributable to coverage for acts of terrorism is: $0.

**PLEASE READ THESE DECLARATIONS, THE POLICY AND ENDORSEMENTS CAREFULLY.**

**CAMICO Mutual Insurance Company**

_____
Authorized Representative



**MUTUAL INSURANCE COMPANY**

### STATE ENDORSEMENT — OREGON

Effective Date:    11/26/2004

Policy Number:    ORL00736-03

**THIS ENDORSEMENT MODIFIES THE INSURANCE PROVIDED UNDER THE
CAMICO PROFESSIONAL LIABILITY POLICY.  PLEASE READ CAREFULLY.**

A.   The following is added to VI. POLICY CONDITIONS, F., Cancellation or Non-Renewal:

**Cancellation**

This Policy may be cancelled for any reason consistent with Oregon law, as is now in effect or hereafter amended.

**Cancellation Of Policies In Effect For More Than 60 Days**

If this Policy has been in effect for 60 days or more, or if this Policy is a renewal of a Policy issued by the Company, then the Company may only cancel the Policy prior to the expiration date for one or more of the following reasons:

    a.   Nonpayment of premium;
    b.   Fraud or material misrepresentation in obtaining the Policy or in presenting a claim under the Policy;
    c.   Substantial increase in the risk of loss after the Policy has been issued or renewed, including but not limited to an increase in exposure due to rules, legislation or court decisions;
    d.   Failure to comply with reasonable loss control recommendations;
    e.   Substantial breach of contractual duties, conditions or warranties;
    f.   Determination by the Director of the Department of Consumer and Business Services that the continuation of a line of insurance or class of business to which the Policy belongs will jeopardize a company's solvency or will place the Company in violation of the insurance laws of Oregon or any other state.
    g.   Loss or decrease in reinsurance covering the risk;
    h.   Any other reason approved by the Director by rule.

If the Company cancels this Policy for any of the reasons stated above, the Company will send by registered mail to the *Named Insured*, at the last known mailing address, a written notice of cancellation stating the effective date of the cancellation and the reason for the cancellation.  The notice will also inform the *Named Insured* of the hearing rights established by ORS.742.704.  The Company will mail this notice at least 10 working days before the effective date of cancellation.  Proof of mailing is sufficient proof of notice.

Under O.R.S. 742.704, any *Insured* may request a hearing before the Director of the Department of Consumer and Business Services, within 30 days after receiving the cancellation notice, to require the Company to establish the existence of the proof or evidence stated in the cancellation notice.

B.   The following is added to VI. POLICY CONDITIONS, F., Cancellation or Non-Renewal:

**Non-Renewal**

This Policy may be non-renewed for any reason consistent with Oregon law, as is now in effect or hereafter amended.

If the Company elects not to renew this Policy, the Company will mail to the *Named Insured* by registered mail a written notice of non-renewal, 60 days prior to the expiration of the Policy, stating the effective date of the non-renewal and a written explanation of the specific reasons for the non-renewal. If, after providing a notice of non-renewal, the Company extends the Policy for a period of up to 90 days, the Company is not required to give an additional notice of non-renewal with respect to that extension. Proof of mailing is sufficient proof of notice.

C.   The following is added to VI. POLICY CONDITIONS, F., Cancellation or Non-Renewal:

**Renewal On Less Favorable Terms or Higher Rates**

If the Company offers to renew the Policy on terms less favorable to the *Named Insured* or at a higher rate, the new terms or rates may take effect on the renewal date if the Company provides notice of the changes to the *Named Insured* at least 30 days prior to the effective date of the renewal. If the Company does not provide such notice, the *Named Insured* may cancel the renewal policy within 30 days after receipt of the notice or delivery of the renewal policy. Earned premium for the period of time that the renewal Policy was in force shall be calculated pro rata at the lower of the current or previous year's rate. If the *Named Insured* accepts the renewal, any premium increase or changes in terms shall be effective immediately following the expiration date of the prior Policy.

The Company is not required to give notice if the change is a premium increase based on the altered nature or extent of the risk insured against.

D.   The following is added to VI. POLICY CONDITIONS, I., Mutual Policy Provisions; Dividends, Voting, Policy Non-Assessable:

**Participation Provision**

4.  It is unlawful for the Company to promise to pay any *Insured* dividends for any unexpired portion of the Policy term or to misrepresent the conditions for dividend payment. Dividends will be due and payable only for a *Policy Period* that has expired and only if declared by and under conditions prescribed by the Company's Board of Directors.

E.   It is agreed that V. *Insured's* Right to *Extended Reporting Coverage*, C. Non-Renewal or Cancellation – Three Year Period, is deleted and replaced by the following:

*Extended Reporting Coverage*

1.  If this policy is cancelled or non-renewed by the *Named Insured* or by the Company for any reason described in paragraph A above, within 30 days the *Named Insured* has the right to purchase *Extended Reporting Coverage* for a three-year period for *Claims* first made against an *Insured* and reported to the Company after the end of the cancelled or non-renewed *Policy Period* arising out of any negligent act, error or omission occuring prior to the end of the *Policy Period* and otherwise covered by this policy. At the sole discretion of the Company, the *Named Insured* may be offered the alternative to purchase *Extended Reporting Coverage* for either a five-year period or a seven-year period.

2.  *Extended Reporting Coverage* under this Section V.C is not available if the right to *Extended Reporting Coverage* is available and is purchased by the *Named Insured* under Section V.B, above.

F.  The following is added to VI. POLICY CONDITIONS:

### Notice to the Company

Whenever an *Insured* is required to provide written notice to the Company, such written notice shall be given to:

CAMICO Mutual Insurance Company
Claims Department
1235 Radio Road
Redwood City, California 94065

## CAMICO®
### MUTUAL INSURANCE COMPANY

### EMPLOYMENT PRACTICES DEFENSE ENDORSEMENT

*Named Insured:*  Geffen, Mesher & Company, P.C.                Effective Date:    11/26/2004

Policy Number:   ORL00736-03

### THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE
### CAMICO PROFESSIONAL LIABILITY POLICY.  PLEASE READ CAREFULLY.

Endorsement Retroactive Date:

In consideration of the *Named Insured's* payment of additional premium, and in reliance upon the *Named Insured's* statements in the application for this endorsement, incorporated herein by reference, CAMICO Mutual Insurance Company ("the Company") agrees with the *Named Insured* as follows:

The following section is added to III. INSURING AGREEMENTS:

**Defense Coverage for Employment Practices**

1.       **Payment of *Claims Expenses*:**  The Company will reimburse the *Named Insured* for *Claims Expenses* incurred in defense of any *Claim* alleging *Damages* against any *Insured*, even if groundless, false or fraudulent, arising from alleged:

   a.  wrongful termination,
   b.  sexual harassment, or
   c.  employment discrimination, including discrimination on the basis of race, national origin, ancestry, sex, marital status, physical or mental handicap, religion, age, sexual preference or pregnancy.

The *Claim* must be first made against the *Insured* and reported to the Company after the Effective Date of this endorsement and during the *Policy Period* AND must be the result of any act, error or omission of any *Insured* which first commenced after the First Issue Date of this endorsement. An act, error or omission which is continuing in nature shall be deemed to have occurred only on the date on which that act, error or omission began and not on any subsequent date. Related or identical acts, errors or omissions shall be deemed to have occurred on the date on which the earliest of such acts, errors or omissions began. A *Multiple Claim* is deemed made and reported to the Company on the date of the first of the *Claims* forming the *Multiple Claim* is reported to the Company.

2.       **Limit of Liability for Employment Practices *Claims Expenses*:**  The maximum amount payable by the Company for Claims Expenses for all Claims covered by this endorsement is $100,000. The Company's reimbursement of *Claims Expenses* pursuant to this endorsement is subject to the *Named Insured's* co-payment of 10% of the covered *Claims Expenses*: the Company shall pay 90% and the policyholder shall pay 10% of all *Claims Expenses* incurred by all *Insureds* under this endorsement. This limit of liability for Employment Practices *Claims Expenses* is separate from the limits of liability applicable to III. INSURING AGREEMENTS, A. Coverage For *Damages* and Reporting Requirements, as stated in the Declarations. No deductible applies to the coverage provided under this endorsement.

3.      **Selection of Counsel:** The *Named Insured* shall have the right to appoint counsel to defend a *Claim* covered by this endorsement.

4.      **Additional Definitions:** For the purposes of coverage under this endorsement, the definition of *Claim Expenses* stated in I. DEFINITIONS, paragraph D. of the Policy is replaced by the following:

> D.  *Claims Expenses* means fees charged by any lawyer designated by the *Named Insured*, and all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a *Claim* covered by this endorsement. *Claim Expenses* do not include: (1) salaries of the Company's employees or independent adjusters, or (2) any fees, costs or expenses incurred by an *Insured* prior to the date the *Claim* out of which such fees and costs arise is first reported to the Company, or (3) fees representing time spent by an *Insured* or costs incurred by an *Insured* in assisting with the handling of a *Claim* or *Multiple Claim*.

5.      **Coverage Period:** The coverage provided by this endorsement is effective upon issuance, and is retroactive only to the First Issue Date of this endorsement as stated above, and not retroactive to the *Retroactive Date* on the Policy Declarations. Coverage provided by this endorsement terminates upon cancellation or non-renewal of the Policy, or upon the Effective Date of *Extended Reporting Coverage* purchased by the *Named Insured*, as described in V. *INSURED'S* RIGHT TO *EXTENDED REPORTING COVERAGE* in the Policy.

6.      **Exclusions:** The coverage provided by this endorsement does not apply:

(a)     to any *Claim* brought by any *Person* who, at any time, is or was an owner, partner or stockholder of the *Named Insured* or any *Predecessor Firm*;

(b)     to any *Claim* which is afforded coverage under any other part of this Policy.

Paragraph E of IV. EXCLUSIONS shall not be the basis for denial of the Company's payment of *Claim Expenses* pursuant to this endorsement.

7.      **Other Insurance:** The coverage provided by this endorsement shall be excess over any other valid insurance available to any *Insured*, including any employers' liability coverage issued to the *Named Insured*, whether such insurance is stated to be primary, contributory, excess, contingent or otherwise. However, this condition does not apply if the other insurance was purchased specifically to apply in excess of the coverage afforded by this endorsement and identifies this coverage as underlying coverage.

All other terms, exclusions, and conditions of the Policy remain unchanged.



Accountants
Professional
Liability
Insurance
Policy

1235 Radio Road
Redwood City
California 94065-1217

(800) 652-1772

Revised 09/02

## NOTICE

THIS INSURANCE POLICY IS A "CLAIMS-MADE AND REPORTED" POLICY. THIS INSURANCE APPLIES ONLY TO *CLAIMS* THAT ARE FIRST MADE AND REPORTED TO THE COMPANY DURING THE *POLICY PERIOD*, OR THAT ARE FIRST MADE AND REPORTED TO THE COMPANY DURING AN *EXTENDED REPORTING COVERAGE* PERIOD, IF PURCHASED.

THIS POLICY DOES NOT COVER PRIOR ACTS UNLESS SPECIFICALLY INCLUDED. THE COMPANY WILL NOT INDEMNIFY OR DEFEND *CLAIMS* ARISING FROM ACTS, ERRORS OR OMISSIONS WHICH OCCURRED PRIOR TO THE POLICY'S *RETROACTIVE DATE*.

THIS POLICY INCLUDES *CLAIMS EXPENSES* IN THE LIMITS OF LIABILITY. THE PAYMENT OF *CLAIMS EXPENSES* REDUCES THE LIMITS OF LIABILITY AVAILABLE TO PAY *DAMAGES* UNLESS PROHIBITED BY APPLICABLE STATE LAW OR AMENDED BY ENDORSEMENT.

THIS POLICY CONTAINS ADDITIONAL RESTRICTIONS ON COVERAGE. PLEASE REVIEW THIS POLICY CAREFULLY, INCLUDING THE DECLARATIONS AND ALL ENDORSEMENTS.

## POLICY TABLE OF CONTENTS

| | | |
|---|---|---|
| I | DEFINITIONS | 1 |
| II. | WHO IS AN INSURED | 2 |
| III. | INSURING AGREEMENTS | 3 |
| | A. Coverage for Damages and Reporting Requirements | 3 |
| | B. Defense and Settlement of Claims | 3 |
| | C. Limits of Liability and Deductibles | 4 |
| | D. Policy Territory | 4 |
| IV. | EXCLUSIONS | 5 |
| V. | INSURED'S RIGHT TO EXTENDED REPORTING COVERAGE | 5 |
| | A. Extended Reporting Coverage | 5 |
| | B. Retirement, Permanent Disability, or Death - Unlimited Period | 6 |
| | C. Non-Renewal or Cancellation - Three Year Period | 6 |
| | D. Right of Qualifying Partner to Purchase Extended Reporting Coverage | 6 |
| | E. Additional Definitions Applicable to This Section | 6 |
| VI. | POLICY CONDITIONS | 7 |
| | A. Insured's Duties Upon Notice of Claim or Potential Claim | 7 |
| | B. Innocent Insured | 7 |
| | C. Transfer and Assignment of Insured's Rights and Duties | 8 |
| | D. Legal Action Against the Company | 8 |
| | E. Other Insurance | 8 |
| | F. Cancellation or Non-Renewal | 9 |
| | G. Change in Membership or Name of Firm | 9 |
| | H. Bankruptcy | 9 |
| | I. Mutual Policy Provisions: Dividends, Voting, Policy Non-Assessable | 9 |
| | J. Entire Contract | 9 |

*ACCOUNTANTS PROFESSIONAL LIABILITY INSURANCE POLICY*

In consideration of the *Named Insured's* payment of premium and Deductible(s), and in reliance upon the *Named Insured's* statements made in the original application and all renewal or supplemental applications, all of which are incorporated into this policy by this reference, CAMICO Mutual Insurance Company ("the Company") agrees with the *Named Insured* as follows:

## I.    DEFINITIONS

Wherever used in this policy, the words or phrases in *italics* have special meanings:

(a)    An *Affiliate* of a specified *Person* means a *Person* that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the *Person* specified.

(b)    *Bodily Injury* means bodily injury, sickness, disease, mental illness, emotional distress or humiliation sustained by a natural person, including death resulting from any of these at any time.

(c)    A *Claim* means a demand received by any *Insured* for money or services, and includes the service of suit(s) or a demand for arbitration. A *Claim* also includes a *Multiple Claim*, which is formed by two or more *Claims* arising out of or resulting from a single act, error or omission in the rendering of *Professional Services*, or from related or identical acts, errors or omissions in the rendering of *Professional Services*, whether such demands are made: (1) against one or more *Insureds*, (2) by one or more *Persons*, or (3) during one or more *Policy Periods*.

(d)    *Claim Expenses* are the fees charged by an attorney designated by the Company to defend any *Insured*, and all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a *Claim*, if incurred by the Company or by an *Insured* at the Company's request. *Claim Expenses* do not include: (1) salaries of the Company's employees or independent adjusters, or (2) any fees, costs or expenses incurred by an *Insured* without the Company's consent.

(e)    *Damages* means a monetary judgment or award, or sums paid in settlement, but does not include: (1) any fine, sanction, penalty, or punitive or exemplary damages; (2) reimbursement of any *Insured's* fees for *Professional Services*; or (3) *Claim Expenses*.

(f)    *Defamation* means the publication or utterance of a libel or slander or other defamatory or disparaging material or a publication or utterance in violation of an individual's right of privacy.

(g) ·    *Extended Reporting Coverage* is an optional coverage offered by the Company under the terms and conditions stated in Section V. *Insured's* Right To *Extended Reporting Coverage* of this policy and the *Extended Reporting Coverage* endorsement issued by the Company. *Extended Reporting Coverage* provides a period of time after the end of the *Policy Period* for reporting a *Claim* arising out of any negligent acts, errors or omissions occurring prior to the end of the *Policy Period* and otherwise covered by this policy.

(h)    An *Insured* means the *Named Insured* and any *Person* who qualifies as an *Insured* under Section II. Who Is An *Insured*.

(i)    The *Named Insured* is the *Person* identified on the Declarations attached to this policy.

(j)    A *Person* means any natural person or legal entity.

(k)     The *Policy Period* is the period of time which begins on the effective date stated on the Declarations and ends on the renewal, termination, expiration or cancellation of this policy, and specifically excludes any *Extended Reporting Coverage*.

(l)     A *Potential Claim* is an event or circumstances that any *Insured* would have a basis to reasonably anticipate may result in a *Claim*.

(m)    *Predecessor Firm* is: (i) any firm, some or all of whose partners or shareholders have joined the *Named Insured*, provided such partners or shareholders produced over 50% of the prior firm's annual gross billings and such billings have been assigned to the *Named Insured*, or (ii) any sole proprietor who joined the *Named Insured* and who has assigned over 50% of the billings from the former sole proprietorship to the *Named Insured*.

(n)     *Professional Services* are any professional services performed by an *Insured* as long as the fees or commissions, if any, or other benefits from such services inures to the benefit of the *Named Insured*. *Professional Services* also includes any *Insured's* services as a member of a formal accreditation, standards review, or other similar professional board or committee that is related to the accounting profession, including services ordinarily performed or advice given in connection with programs sponsored by the American Institute of Certified Public Accountants or any state society of Certified Public Accountants.

(o)     *Property Damage* means physical injury to, conversion of, or destruction of tangible property, including the loss of use of tangible property.

(p)     *Related Individual* means the spouse, children, and/or parents of any *Insured*, and any trust or estate of which any of them is a beneficiary.

(q)     The *Retroactive Date*, stated in the Declarations, is the earliest date from which this policy provides coverage for *Professional Services*.

## II.     WHO IS AN *INSURED*

Each of the following *Persons* is an *Insured*, but only while performing *Professional Services* for the benefit of the *Named Insured* or a *Predecessor Firm* on or after the *Retroactive Date*:

(a)     The *Named Insured* identified in the Declarations or in an endorsement.

(b)     A current or former owner, partner, shareholder or employee of a *Named Insured*.

(c)     Any *Person* who, during the *Policy Period*, becomes an owner, partner, shareholder or employee of a *Named Insured*.

(d)     Temporary staff or a contract employee of a *Named Insured*, but only for *Professional Services* performed on behalf of and under the direct supervision of a *Named Insured*.

(e)     A *Predecessor Firm*.

(f)     A *Person* acquired by or merged with a *Named Insured* during the *Policy Period*, but only for *Professional Services* provided after the acquisition or merger.

(g)     The legal representative of an *Insured*, but only to the extent of that *Insured's* rights and duties under this policy.

### III. INSURING AGREEMENTS

#### A. Coverage for *Damages* and Reporting Requirements

The Company will pay those sums that an *Insured* becomes legally obligated to pay as *Damages* because of a *Claim* arising out of an *Insured's* negligent act, error or omission in rendering or failing to render *Professional Services* performed after the *Retroactive Date* and before the end of the *Policy Period.* The *Claim* must be first made against the *Insured* and reported to the Company during the same *Policy Period.* An act, error or omission which is continuing in nature shall be deemed to have occurred only on the date on which that act, error or omission began and not on any subsequent date. Related or identical acts, errors or omissions shall be deemed to have occurred on the date that the earliest of those acts, errors or omissions began. A *Multiple Claim* is deemed made and reported to the Company on the date the first of the *Claims* forming the *Multiple Claim* is reported to the Company.

This policy does not cover: (1) any *Claims* reported to any insurer prior to the effective date of the *Policy Period* identified in the policy's Declarations, or (2) any *Claims* arising from circumstances which, prior to the effective date of the *Policy Period,* any *Insured* would have had a basis to reasonably anticipate may result in a *Claim.*

If the *Named Insured* first becomes aware of a *Potential Claim* during the *Policy Period* and provides the Company with written notice as described at Section VI. Policy Conditions, A.1, then any *Claim* that may be made later against an *Insured* arising from those acts, errors or omissions will be deemed reported to the Company on the date the Company received the written notice of the *Potential Claim.*

No *Claim* shall be deemed first made against an *Insured* during the *Policy Period* if any *Insured* reported that *Claim* as a *Claim* or *Potential Claim* to the Company or to any other professional liability insurer, or if that *Claim* or *Potential Claim* was known to any *Insured,* before the effective date of the *Policy Period.* If any *Insured* becomes aware of a *Claim* during the *Policy Period* and reports that *Claim* to the Company within 30 days of the date of expiration of that *Policy Period,* that *Claim* shall be deemed reported to the Company on the last day of that *Policy Period.*

#### B. Defense and Settlement of *Claims*

1. The Company has the right and duty to defend and settle *Claims* alleging *Damages,* even if the *Claim* is groundless, false or fraudulent. The Company has the right to appoint counsel and to investigate and negotiate settlement of any *Claim.*

2. The Company will not settle any *Claim* without the *Named Insured's* written consent. If the *Named Insured* withholds its consent to any settlement recommended by the Company and elects to contest a *Claim* or continue the legal proceedings, then the Company's liability for that *Claim* will not exceed: (1) the amount of the recommended settlement plus *Claim Expenses* incurred up to the date the *Named Insured* withheld its consent, or (2) the remaining Limit of Liability, whichever is less.

3. The Company will cease defending and/or paying *Claim Expenses* when the applicable Limit of Liability has been exhausted by payment of *Damages* or *Claim Expenses.*

4. The Company may elect to defend an *Insured* at disciplinary hearings before the state entity responsible for regulating the practice of accountancy when such hearings may relate to a *Claim* or *Potential Claim* against an *Insured.* However, the Company has no duty to indemnify an *Insured* for any monetary assessment or penalty that may be levied against an *Insured* as a result of those hearings.

### C. Limits of Liability and Deductibles

#### 1. Limit of Liability – Per *Claim*

The maximum amount payable by the Company for *Damages* and *Claim Expenses* for each covered *Claim* is the Per *Claim* Limit of Liability as stated in the Declarations. A single Per *Claim* limit of liability applies to a *Multiple Claim*, regardless of the number of claimants, lawsuits, or *Insureds* involved.

#### 2. Limit of Liability – Policy Aggregate

The maximum amount payable by the Company for *Damages* and *Claim Expenses* for all covered *Claims* made and reported during the *Policy Period* is the Limit of Liability: Policy Aggregate, as stated in the Declarations.

#### 3. Deductible – Per *Claim*

The *Named Insured* shall pay a Deductible – Per *Claim*, in the amount stated on the Declarations for *Claim Expenses* and *Damages* resulting from each *Claim*. The *Named Insured* is responsible for reimbursing the Company for the Deductible.

The Company will reimburse the *Named Insured* a portion of the Deductible – Per *Claim* under the following circumstances: (a) when any *Insured* reports a *Potential Claim* to the Company prior to the *Claim* being made against the *Insured*; or (b) when the *Named Insured* agrees to use formal mediation to seek a resolution of a *Claim*. Under either of these circumstances, the Company will reduce the applicable Deductible – Per *Claim* by 50 percent, up to a maximum of $50,000.

#### 4. Deductible – Policy Aggregate

When the *Named Insured* has purchased a Deductible – Policy Aggregate, the maximum amount of Deductible(s) payable by the *Named Insured* with respect to all *Claims* first made against an *Insured* and reported to the Company during the *Policy Period* is the Deductible – Policy Aggregate as stated on the Declarations.

#### 5. Expenses for *Potential Claims*

Any expenses incurred by the Company on behalf of an *Insured* prior to a *Claim* being made are not chargeable against the Deductible – Per *Claim* or Limits of Liability.

#### 6. Reimbursement of the Company

If the Company pays any *Claim Expenses* or *Damages* within the Deductible – Per *Claim* or Deductible – Policy Aggregate or in excess of the applicable Limit of Liability, the *Named Insured* shall reimburse the Company within 30 days of the Company's request. All *Insureds* are jointly and severally liable for reimbursement of these amounts to the Company.

### D. Policy Territory

This insurance applies to *Claims* made anywhere in the world.

## IV.  EXCLUSIONS

This policy does not apply to:

(a)  **Intentional Misconduct:**  Any *Claim* based on or arising out of a dishonest, fraudulent, malicious or criminal act, error or omission of any *Insured*.  The Company will defend, but not indemnify, any *Claim* alleging an *Insured* participated, aided or abetted in a civil conspiracy.

(b)  ***Bodily Injury/Property Damage:***  Any *Claim* based on or arising from *Bodily Injury* or *Property Damage*, but this exclusion shall not apply to any *Claim* seeking *Damages* for humiliation or emotional distress based upon allegations of *Defamation*.

(c)  ***Claims* By An *Insured*:**  Any *Claim* made by an *Insured* against an *Insured*.

(d)  ***Insured* Acting In Another Capacity:**  Any *Claim* in connection with or arising out of the service of any *Person*, who is an *Insured*, acting as an employee, officer or director of any company, business, entity or charitable organization other than the *Named Insured*.

(e)  **Employment Practices Liability:**  Any *Claim* in connection with or arising out of any *Insured's* employment obligations, decisions, practices or policies as an employer, including, but not limited to, acts of discrimination, humiliation or harassment and acts in violation of the Americans with Disabilities Act.

(f)  **Other Business Entities:**  Any *Claim*, whether or not related to *Professional Services*, made by, in the right of, against, in connection with or arising out of any entity not named in the Declarations in which:

> 1.  any *Person* who is an *Insured* (or an *Affiliate* or *Related Individual* of that *Person*) is or was at any time managing, controlling or operating the entity; or
> 2.  the aggregate ownership of all *Persons* who are *Insureds* (including *Affiliates* and *Related Individuals* of such *Persons*) at any one time was or is more than twenty percent (20%).

(g)  ***Claims* Seeking Return of *Insured's* Fees:**  That part of any *Claim* seeking the return of or reimbursement of fees for *Professional Services*.

(h)  **Punitive or Exemplary Damages:**  Indemnity of any punitive or exemplary damages, fines, sanctions or penalties, unless required by law.

(i)  ***Claims* Following *Insured's* Suit For Fees:**  Any *Claim* made by any *Person* after an *Insured* has sued such *Person* (or *Affiliate* of such *Person*) to obtain payment of fees for *Professional Services*, unless that *Insured* has consulted with the Company prior to filing the suit.  This exclusion does not eliminate coverage for any *Claim* made after an *Insured's* use of arbitration or mediation to resolve a fee dispute with the *Person* making the *Claim*.

(j)  **Products Liability:**  Any *Claim* in connection with or arising out of the use of, or existence of any condition in or a warranty of, products sold or distributed by an *Insured*.

## V.  *INSURED'S* RIGHT TO *EXTENDED REPORTING COVERAGE*

### A.  *Extended Reporting Coverage*

The *Named Insured* may purchase *Extended Reporting Coverage*, as described below, because of any of the following Events:

1.    A *Named Insured* who is a sole proprietor becomes *Retired* or *Permanently Disabled*, or a two-professional firm's business is *Discontinued* because one of the professionals becomes *Retired* or *Permanently Disabled*;

2.    A *Named Insured* who is a sole proprietor dies, or a two-professional firm's business is *Discontinued* because one of the professionals dies; or

3.    The *Named Insured* cancels or non-renews this policy or the Company cancels or non-renews this policy for any reason other than non-payment of premium, and there are no amounts owed by the *Named Insured* to the Company, including sums due for premium or Deductibles.

The Company will determine the premium for *Extended Reporting Coverage* upon receipt of the *Named Insured's* request. The Limits of Liability for the *Extended Reporting Coverage* are separate from and shall not exceed the Limits of Liability of the last policy in effect.

**B.      Retirement, Permanent Disability, or Death – Unlimited Period**

1.    If a firm is *Discontinued* for reasons described in paragraphs A.1 or A.2, above, then within 30 days of such discontinuation the *Named Insured* or the deceased *Insured's* estate has the right to purchase unlimited *Extended Reporting Coverage* for *Claims* first made against the *Named Insured* and reported to the Company after the end of the *Policy Period* arising out of any negligent act, error or omission occurring prior to the end of the *Policy Period* and otherwise covered by this policy.

2.    Extended Reporting Coverage under this Section V.B is not available if the right to *Extended Reporting Coverage* is available and is purchased by the *Named Insured* under Section V.C, below.

**C.      Non-Renewal or Cancellation – Three Year Period**

1.    If this policy is cancelled or non-renewed by the *Named Insured* or by the Company for any reason described in paragraph A above, within 30 days the *Named Insured* has the right to purchase *Extended Reporting Coverage* for a three-year period for *Claims* first made against an *Insured* and reported to the Company after the end of the cancelled or non-renewed *Policy Period* arising out of any negligent act, error or omission occurring prior to the end of the *Policy Period* and otherwise covered by this policy.

2.    *Extended Reporting Coverage* under this Section V.C is not available if the right to *Extended Reporting Coverage* is available and is purchased by the *Named Insured* under Section V.B, above.

**D.      Right of *Qualifying Partner* to Purchase *Extended Reporting Coverage***

If the *Named Insured* fails, or has no right, to purchase *Extended Reporting Coverage*, any *Qualifying Partner* may purchase *Extended Reporting Coverage* providing coverage solely to the *Qualifying Partner*. The *Named Insured* is responsible for notifying any *Qualifying Partner(s)* of any change in the *Named Insured's* coverage.

**E.      Additional Definitions Applicable to This Section**

1.    *"Retired"* means the *Insured*: (a) has reached age 55, and (b) has completely ceased providing *Professional Services*.

2.    *"Permanently Disabled"* means the *Insured* is medically judged to be totally and permanently unable to provide *Professional Services*, and has sold or discontinued his/her certified public accounting practice as a result of the disability. Proof of such disability must be provided upon the Company's request.



3. The business of a two-professional firm is *"Discontinued"* when: (a) both professionals are *Retired,* are *Permanently Disabled* or have died, or (b) one professional has *Retired,* has become *Permanently Disabled* or has died, and the other professional has sold the firm's business to an unrelated party.

4. A *"Qualifying Partner"* is a former partner or shareholder, or his/her legally appointed representative, who was not a partner or shareholder of the *Named Insured* on the date the right to purchase *Extended Reporting Coverage* lapsed or on the date unpaid premiums or other amounts became due to the Company from the *Named Insured.*

## VI.   POLICY CONDITIONS

### A.   *Insured's* Duties Upon Notice of *Claim* or *Potential Claim*

1. As a condition precedent to coverage, an *Insured* must promptly notify the Company or its authorized representative of any *Claim* or *Potential Claim,* and include the following information, if available:

   (a) The name and address of the claimant or potential claimant, and all other involved individuals;

   (b) A description of the *Professional Services* provided, or that should have been provided, and the *Damages* that may result;

   (c) The *Insured's* explanation of why the *Claim* was made or why the *Potential Claim* may become a *Claim*;

2. An *Insured* must:

   (a) Upon receipt of a *Claim*: (i) immediately send to the Company copies of any demands, notices, summonses or legal papers received in connection with the *Claim*; (ii) authorize the Company to obtain records and other information; and (iii) cooperate with the Company in the investigation, defense, and settlement of the *Claim.*

   (b) Upon request, assist the Company in enforcing any right against any *Person* that may be liable to an *Insured* because of *Damages* to which this insurance applies.

   (c) Refuse, except at the *Named Insured's* own cost, to admit any liability, assume any *Damages,* voluntarily make any payments, or incur any *Claim Expenses.*

3. The Company will pay the *Named Insured* a per diem of $300.00 per day, up to a maximum payment of $6,000.00 per *Claim,* to compensate an *Insured* for attendance at mediation, arbitration or trial proceedings at the Company's request.

### B.   Innocent *Insured*

1. If coverage for a *Claim* would be void, excluded, suspended or lost as a result of any *Insured's* acts, errors or omissions excluded from coverage by Section IV. Exclusions, A. Intentional Misconduct, then this Policy's coverage will continue to apply to any innocent *Insured* who did not personally commit; participate, or acquiesce or remain passive after having personal knowledge of such acts, errors or omissions, provided that upon acquiring personal knowledge, the innocent *Insured* promptly gives notice to the Company in accordance with Section III. Insuring Agreements, A. Coverage for *Damages* and Reporting Requirements, and Section VI. Policy Conditions, A. *Insured's* Duties Upon Notice of *Claim* or *Potential Claim.*

2. If any coverage for a *Claim* would be void, excluded, suspended or lost by as a result of any *Insured's* failure to comply with the reporting requirements of Section III. Insuring Agreements, A. Coverage for *Damages* and Reporting Requirements, and Section VI. Policy Conditions, A. *Insured's* Duties Upon Notice of *Claim* or *Potential Claim*, then this Policy's coverage will continue to apply to any innocent *Insured* who did not fail to comply with the reporting requirements of this Policy, provided that:

    (a) the innocent *Insured* promptly gives notice to the Company in accordance with the provisions of Section III. Insuring Agreements, A. Coverage for *Damages* and Reporting Requirements, and Section VI. Policy Conditions, A. *Insured's* Duties Upon Notice of *Claim* or *Potential Claim*, and

    (b) the *Named Insured* is continuously insured by the Company through the date upon which notice is received by the Company.

3. These provisions do not extend coverage to any *Insured* when coverage is void, excluded, suspended or lost because of any other *Insured's* non-compliance with disclosure of information required on any policy application or policy renewal application.

## C. Transfer and Assignment of *Insured's* Rights and Duties

1. No *Insured* may transfer or assign any *Insured's* rights or interest in, or duties under, this policy without the Company's written consent.

2. If the Company makes any payment for *Damages* and/or *Claim Expenses*, it shall be subrogated to all of the *Insured's* rights of recovery against anyone, and the *Insured* shall do whatever is necessary to secure such rights. After becoming aware of a *Claim* or a *Potential* Claim, no *Insured* shall do anything to prejudice the Company's subrogation rights.

3. Any monetary recoveries will be distributed between the *Named Insured* and the Company in proportion to the amounts paid by the *Named Insured* within the Deductible – Per *Claim* and by the Company within the Limits of Liability.

## D. Legal Action Against the Company

1. No *Insured* shall seek to join the Company as a party to a suit that seeks *Damages* from an *Insured* or sue the Company unless: (a) all of the terms and conditions of this policy have been met, and (b) the amount of the *Insured's* obligation to pay *Damages* has been finally determined either by judgment against the *Insured* after an actual contested trial or by written agreement of the *Insured* and the claimant with the prior written consent of the Company.

2. If an *Insured* and the Company dispute whether this policy provides coverage for a *Claim*, all *Insureds* agree that the parties will meet with a qualified mediator in a good faith effort to negotiate a resolution of the dispute prior to the initiation of any legal proceeding. The mediation will continue until the dispute is resolved, or until the mediator notifies the parties that it is unlikely that the dispute will be resolved through mediation, or until any party elects to end the mediation after a minimum of thirty (30) days after the first mediation session.

## E. Other Insurance

This insurance shall be excess over any other valid insurance available to any *Insured*, whether such insurance is stated to be primary, contributory, excess, contingent or otherwise. However, this condition does not apply if the other insurance was purchased specifically to apply in excess of this insurance and identifies this policy as primary insurance.

### F. Cancellation or Non-Renewal

The Company may cancel this policy for any reason consistent with state law, as described in the State Endorsement issued with this policy.

The *Named Insured* may cancel this policy by written notice to the Company accompanied by surrender of the policy to the Company or any of the Company's authorized agents, or by mailing written notice to the Company at the location stated in an endorsement issued with this policy. The written notice must state the date on which the *Named Insured* requests cancellation to become effective. The mailing of notice by the *Named Insured* shall be sufficient proof of notice. The time of surrender shall become the end of the *Policy Period*. Delivery (where permitted by law) of such written notice by the *Named Insured* shall be equivalent to mailing.

### G. Change in Membership or Name of Firm

The Company has the right to assess and charge an additional premium if, in the reasonable judgment of the Company, there is a significant increase in the size or other risk characteristics of the *Named Insured*.

### H. Bankruptcy

The bankruptcy or insolvency of the *Named Insured* will not relieve the Company or any *Insured* of any obligations under this policy.

### I. Mutual Policy Provisions: Dividends, Voting, Policy Non-Assessable

1. The *Named Insured* is a member of the Company and shall participate in the distribution of dividends fixed and determined by the Board of Directors.

2. The *Named Insured* is entitled to vote, either in person or by proxy, at all meetings of the Company, pursuant to the Bylaws and Articles of Incorporation of the Company.

3. This policy is not assessable.

### J. Entire Contract

By accepting this policy, each *Insured* agrees that the statements in the Declarations and in each application for renewal or supplementary application are his/her agreements and representations, that this policy is issued in reliance upon the truth of such representations, and that this policy embodies all agreements existing between each *Insured* and the Company or any of its agents relating to this insurance.

IN WITNESS WHEREOF, the Company has caused this policy to be signed by its President and a Secretary and countersigned on the Declarations page by a duly authorized representative of the Company.

**PRESIDENT**

**SECRETARY**

PL-1000-A

9

Revised 09/02

# EXHIBIT 4

RE...
DEC 0 7 2006

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

| | |
|---|---|
| SYNECTIC VENTURES I, LLC, an Oregon limited liability company; SYNECTIC VENTURES II, LLC, an Oregon limited liability company; SYNECTIC VENTURES III, LLC, an Oregon limited liability company; BRITISH COLUMBIA INVESTMENT MANAGEMENT CORPORATION; LEVRICK LIMITED; 3536297 CANADA INC., and SCOTT ANDERSON, an individual investor; GORDON BARKER, an individual investor; HAYDEN ISLAND INVESTMENT, LLC, an Oregon limited liability company; P.J. BRIX, LLC, an Oregon limited liability company; BRUCE and JUDITH BROWN, an individual investor; SHARON COOPER, an individual investor; PETER COOPERRIDER, an individual investor; LAURA CROUCH, an individual investor; JAY and TRACY DEIGLMEIER, an individual investor; LEWIS & CLARK COLLEGE, an Oregon nonprofit corporation; SCOTT and KAREN EWELL, an individual investor; ZACHARY FRANKS, an individual investor; ROBERT FULTON, an individual investor; CAMERON and ELIZABETH GREEN, an individual investor; ERIC GREENSPAN, an individual investor; KIRK and LISA HALL, an individual investor; EDWARD BENJIMAN HART, an individual investor; CHARLES and SALLY HEFFRON, an individual investor; STEVEN and KAY HEINZ, an individual investor; KASEL ASSOCIATES, | No.: 0512-13245

THIRD AMENDED COMPLAINT

(Breach of Contract, Breach of Implied Covenant of Good Faith and Fair Dealing, Breach of Fiduciary Duty, Negligence, Fraud, Conversion, Aiding and Abetting (Rest. 2d Torts sec. 876), Accounting Malpractice, Negligent Misrepresentation)


CLAIM EXCEEDS $50,000

CLAIM NOT SUBJECT TO MANDATORY ARBITRATION

DEMAND FOR JURY TRIAL |

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

```
 1 | LLC, a Washington limited liability
   | company; CAROLYN KIMBALL
 2 | HOLMQUIST TRUST, an individual
   | investor; PETER and KATHLEEN
 3 | MANLEY, an individual investor; DONALD
   | MARQUARDT, an individual investor;
 4 | MICHAEL MENASHE, an individual
   | investor; TRACI PARKER, an individual
 5 | investor; DAVID MILLOY, an individual
   | investor; LESTER V. NOVAKOVICH BY-
 6 | PASS TRUST; an individual investor;
   | EDWARD and BARBARA PALMER, an
 7 | individual investor; ALEXANDER and
   | LAURA PAUL, an individual investor;
 8 | ALEXANDER INVESTMENT SERVICES
   | LTD PENSION TRUST, an Oregon
 9 | Corporation; MARVIN and RUTH
   | PETERSON, an individual investor; RALPH
10 | M. RICHART, an individual investor; GREG
   | and CLAUDIA ROLANDER, an individual
11 | investor; HAROLD AND ARLENE
   | SCHNITZER CARE FOUNDATION, an
12 | Oregon nonprofit corporation; THE
   | JORDAN SCHNITZER FAMILY
13 | FOUNDATION, an Oregon nonprofit
   | corporation; SN PROPERTIES, a Delaware
14 | Limited Liability Company; JORDAN
   | SCHNITZER, an individual investor; SCOTT
15 | SHEFFIELD, an individual investor; JAMES
   | SIZEMORE, an individual investor;
16 | SIZEMORE ASSOCIATES, INC., a
   | Washington Corporation; DAVID and RUTH
17 | SWEDLOW, an individual investor; FRANK
   | TROMBETTA, an individual investor;
18 | TYKESON FAMILY CHARITABLE
   | TRUST, an Oregon nonprofit corporation;
19 | HAPPY VALLEY LEASING, an Oregon
   | corporation; CRAIG WEBER, an individual
20 | investor; JOSEPH WENDER, an individual
   | investor; ROBERT F. WILKINS, an
21 | individual investor; TERESA L. LAREAUX
   | (f/k/a WILKINS), an individual investor; US
22 | TRUST COMPANY as trustee for the
   | ANDREW M. HAY TRUST, an individual
23 | investor; GRANITE HEAD PROPERTY, an
   | Oregon limited liability company; JEREMY
24 | YOUNG, an individual investor;
   | LARPENTEUR FBO SCHWABE
25 | WILLIAMSON WYATT 401(K), an
   | individual investor,
26 |                           Plaintiffs,
```

Page 2–   THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1      v.

2 CRAIG L. BERKMAN, an individual;
ARTHUR ANDERSEN, LLP, a foreign
3 limited liability partnership; GEFFEN
MESHER & COMPANY, P.C., an Oregon
4 corporation; RICHARD L. HAWKINS, an
individual; SYNECTIC VENTURES
5 MANAGEMENT I, INC., an Oregon
corporation; SYNECTIC VENTURES
6 MANAGEMENT II, INC., an Oregon
corporation; SYNECTIC VENTURES
7 MANAGEMENT III, INC., an Oregon
corporation; SYNECTIC ASSET
8 MANAGEMENT, INC., an Oregon
corporation,
9                 Defendants.

10

11                               1.

12       Plaintiffs bring this case on grounds of breach of contract, breach of fiduciary duty,

13 malpractice, fraud, misappropriation, and concealment. Plaintiffs are venture capital

14 investment Funds (the "Funds") and certain individual investors in those Funds. Defendant

15 Craig Berkman formed the Funds and solicited money that was meant to be invested in

16 Oregon and regional start-up companies. But he instead took the money: (1) for his personal

17 benefit and to benefit his business interests and, (2) to pay off personal pre-existing debts. In

18 addition, Berkman charged the Funds a management fee of approximately $5 million to do

19 this.

20                               2.

21       Defendants Arthur Andersen, Geffen Mesher, and Richard Hawkins ("Hawkins")

22 provided professional accounting services to the Funds and breached duties they owed as

23 CPA's, and aided and abetted Berkman's misappropriation and breaches of fiduciary duty.

24 They also made negligent and intentional misrepresentations to the Funds and the Fund

25 members. Each defendant independently and collectively concealed each other's

26 misconduct.

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

3.

Plaintiffs are:

a. Synectic Ventures I LLC, an Oregon limited liability company formed on January 9, 1998, and formerly known as CB (Berkman) Capital LLC—hereafter referred to as "Fund I";

b. Synectic Ventures II LLC, an Oregon limited liability company formed on December 8, 1998, and formerly known as CB (Berkman) Capital II LLC—hereafter referred to as "Fund II";

c. Synectic Ventures III LLC, an Oregon limited liability company formed on July 29, 1998, and formerly known as CB (Berkman) Capital II-A LLC—hereafter referred to as "Fund III";

d. 3536297 Canada, Inc., an affiliate of the British Columbia Investment Management Corporation and successor-in-interest to Levrick Limited (collectively "bcIMC") who are members in Fund I and Fund II; and

e. The following individual investors who are members in the plaintiff Funds:

Levrick Limited; 3536297 Canada, Inc.; Scott Anderson; Gordon Barker; Hayden Island Investment, LLC; P.J. Brix, LLC; Bruce and Judith Brown; Sharon Cooper; Peter Cooperrider; Laura Crouch; Jay and Tracy Deiglmeier; Lewis & Clark College; Scott and Karen Ewell; Zachary Franks; Robert Fulton; Cameron and Elizabeth Green; Eric Greenspan; Kirk and Lisa Hall; Edward Benjiman Hart; Charles and Sally Heffron; Steven and Kay Heinz; Kasel Associates, LLC; Carolyn Kimball Holmquist Trust; Peter and Kathleen Manley; Donald Marquardt; Michael Menashe; Traci Parker; David Milloy; Lester Novakovich By-Pass Trust; Edward and Barbara Palmer; Alexander and Laura Paul; Alexander Investment Services Ltd. Pension Trust; Marvin and Ruth Peterson; Ralph M. Richart; Greg and Claudia Rolander; Harold and Arlene Schnitzer Care Foundation; The Jordan Schnitzer Family Foundation; SN Properties; Jordan Schnitzer; Scott Sheffield; James

Page 4– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1   Sizemore; Sizemore Associates, Inc.; David and Ruth Swedlow; Frank Trombetta; Tykeson

2   Family Charitable Trust; Happy Valley Leasing; Craig Weber; Joseph Wender; Robert F.

3   Wilkins; Teresa L. LaReaux (f/k/a Wilkins); US Trust Company as trustee for the Andrew

4   M. Hay Trust; Granite Head Property; Jeremy Young, an individual investor; and Larpenteur

5   FBO Schwabe Williamson Wyatt 401(k), an individual investor.

6                                               4.

7           Defendants are:

8           a.      Craig Berkman, an individual, a resident of the State of Oregon, and who at all

9   material times transacted business in Multnomah County, Oregon.  Berkman was also at all

10  material times the owner, director, officer, and/or agent of defendants SVM I, SVM II, SVM

11  III, CB&A;

12          b.      Synectic Ventures Management I, Inc. ("SVM I"), formerly known as CBC I,

13  Inc., an Oregon corporation transacting business in Multnomah County, Oregon, operated as

14  the Fund I manager;

15          c.      Synectic Ventures Management II, Inc. ("SVM II"), formerly known as

16  CBC II, Inc., an Oregon corporation transacting business in Multnomah County, Oregon,

17  operated as the Fund II manager;

18          d.      Synectic Ventures Management III, Inc. ("SVM III"), formerly known as

19  CBC II-A, Inc., an Oregon corporation transacting business in Multnomah County, Oregon,

20  operated as the Fund III manager;

21          e.      Synectic Asset Management, Inc., formerly known as Craig Berkman &

22  Associates, Inc. (referred to in this Third Amended Complaint as "CB&A"), an Oregon

23  corporation transacting business in Multnomah County, Oregon, contracted with SVM I, II,

24  and III to perform management duties for the Funds;[1]

25  _____

26  [1] Unless otherwise specified, "Berkman" means Craig Berkman, SVM I, SVM II, SVM III,
    and CB&A.

Page 5-   THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1        f.      Arthur Andersen, LLP, a foreign limited liability partnership transacting

2 business and providing accounting services in Multnomah County, Oregon;

3        g.      Geffen Mesher & Company, P.C., an Oregon corporation transacting business

4 in Multnomah County, Oregon; and

5        h.      Richard L. Hawkins, an individual and partner with Arthur Andersen, LLP and

6 shareholder of Geffen Mesher & Company, PC.

7 **JURISDICTION AND VENUE**

8 5.

9      At all times material herein, the Funds were and are duly registered Oregon limited

10 liability companies doing business in Multnomah County, Oregon. The Funds have standing

11 to bring these claims pursuant to ORS 63.077(2)(a). bcIMC was and is a resident of Canada.

12 6.

13      Berkman and Hawkins are individuals who at all material times either resided in the

14 State of Oregon or had substantial contacts with Multnomah County, Oregon, through

15 business they conducted in Multnomah County, Oregon.

16 7.

17      SVM I, SVM II, SVM III, and CB&A were at all material times Oregon corporations

18 transacting business in Multnomah County, Oregon.

19 8.

20      Arthur Andersen was and is at all material times a duly registered foreign limited

21 liability partnership transacting business in Multnomah County, Oregon. Arthur Andersen

22 LLP is the entity that provided accounting services described in this Third Amended

23 Complaint. To the extent any other Arthur Andersen-related entities provided services,

24 plaintiffs will amend to name the proper entity.

25 9.

26      Geffen Mesher is and was at all material times a duly registered Oregon corporation

Page 6—    THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1    transacting business in Multnomah County, Oregon.

2                              **FACTS COMMON TO ALL CLAIMS**

3                                          10.

4          Between December 1997 and January 2001, Berkman solicited investments through

5    and for the Funds in the approximate amount of $75 million.

6                                          11.

7          Defendants Arthur Andersen and Hawkins provided accounting services to the Funds

8    beginning in 1998.  In 1999 those services included bookkeeping and preparation of financial

9    statements and compilation reports.  Arthur Andersen prepared financial statements and

10   compilation reports for 1998, 1999, and 2000.

11                                         12.

12         Richard Hawkins was the partner at Arthur Andersen who had primary control of and

13   responsibility for the Funds' accounts.  Before they worked for the Funds (and while

14   working for the Funds), Arthur Andersen and Richard Hawkins performed accounting

15   services for certain companies in which the Funds invested ("portfolio companies").  Those

16   companies included APN, Cascade Ventures, SuperTracks, GeoTrust, WellPartner, EVI,

17   PuriPonics, Oxibio and Preview Systems.

18                                         13.

19         For several years before forming the Funds, Berkman borrowed money from other

20   individuals and companies by pledging his interest in certain companies.  Berkman used the

21   money he received from those loans for his own benefit.  By 1995, investors and the

22   companies Berkman purported to represent questioned the loans because it appeared that

23   Berkman was pledging a greater interest than he actually controlled or owned.  Arthur

24   Andersen was contemporaneously aware of those complaints.

25                                         14.

26         Berkman, with the assistance of his accountants, Arthur Andersen and Geffen

Page 7–    THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1  Mesher, and through false and misleading financial records and reports, concealed the fact
2  that the Funds' money was used to pay those loans.

3                                                        15.

4          Berkman employed an investment scheme that placed his interests ahead of that of the
5  Funds. That scheme included: (1) the transfer of Fund assets to himself, CB&A, and to at
6  least two other funds he or CB&A controlled; (2) use of Fund assets in transactions to
7  conceal the fact that Berkman and CB&A misappropriated money; and (3) transfer of Fund
8  assets to Berkman and/or CB&A in exchange for securities worth less than what the Funds
9  paid.

10                                                       16.

11         Berkman's misappropriation of Fund assets began with the first money invested when
12  Berkman took $200,000 from the Funds on December 30, 1997. In the Funds' books and
13  records, Berkman recorded the money taken as a purchase of Endovascular Instruments
14  ("EVI") stock, a Portland-based medical device start-up company. But Berkman hid the fact
15  that the EVI stock was not purchased until 1999. Arthur Andersen—who was EVI and the
16  Funds' accountant at this time—knew or should have known of this misappropriation and
17  concealment. In fact, on December 30, 1997, Berkman purchased $200,000 worth of EVI
18  stock for himself. Berkman used Fund assets for that purchase.

19                                                       17.

20         By December 31, 1998, Berkman had transferred at least $1.86 million from Fund I to
21  CB&A, purportedly to an "Investment Account." But at least $1.6 million of that money was
22  instead funneled back to Berkman, who concealed this fact from the Funds' members by
23  issuing false and misleading financial reports to them.

24                                                       18.

25         By March 1999, Arthur Andersen had financial records showing that as of December
26  31, 1998, CB&A had received at least $1.86 million of Fund I cash, which CB&A was

Page 8–   THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-7089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1   purportedly holding in an "Investment Account." But CB&A did not hold the money for

2   Fund I; it instead transferred at least $1.6 million to Berkman. Based on material errors in

3   the Funds' financial records that were provided to Arthur Andersen, and on Arthur

4   Andersen's knowledge of Berkman's prior financial activities, Arthur Andersen had a duty to

5   confirm that CB&A held the $1.86 million for Fund I. Andersen failed to do so. Instead,

6   Berkman and Arthur Andersen categorized the money transferred to CB&A as "cash or cash

7   equivalents" on Fund I's income tax returns and financial statement provided to Fund

8   members; thereby concealing the misappropriation.

9                          19.

10       In early 1999, in an ongoing effort to conceal his misappropriation of Fund I money,

11   Berkman began moving money from Fund III to CB&A to reduce the balance of the Fund I

12   "Investment Account" purportedly held by CB&A. Berkman did this by recording in Fund

13   III's books and records phantom purchases by CB&A for Fund of stock in a company called

14   Preview Systems. But Berkman instead used Fund III's money to reduce the balance CB&A

15   owed Fund I.

16                          20.

17       Berkman created false reports showing that Fund III owned $5.6 million of Preview

18   Systems stock. But according to the brokerage account statement, Berkman, through CB&A,

19   used no more than $1.2 million to actually purchase Preview Systems stock for Fund III.

20                          21.

21       Arthur Andersen knew that the transfer of cash from the Funds to CB&A during 1998

22   and 1999 in an aggregate amount of $5,739,250 was not supported by documentation or

23   other indicia of ownership of Preview Systems stock. Yet Arthur Andersen prepared year-

24   end 1999 financial statements and reports for the Funds that listed the Preview Systems

25   purchases as Fund assets. Those financial statements were distributed to Fund members.

26   Then, on April 25, 2000, Arthur Andersen wrote to Berkman and asked him to confirm that

Page 9– THIRD AMENDED COMPLAINT

1  stock certificates existed for the Preview Systems stock, and undertook the obligation to
2  confirm the purchases. Arthur Andersen accepted Berkman's statement that the purchases
3  were made, with no further inquiry. Arthur Andersen was Preview Systems' auditor at this
4  time and had been the auditor at the time of Preview Systems' initial public stock offering on
5  December 8, 1999.

6                                          22.

7         Arthur Andersen's April 25, 2000, letter also listed the following open items:
8  "[Promissory] notes need to be written for the cash transfers between CB Capital I, II, II-A
9  [the Funds] and CB & Associates [CB&A]." Thus, Arthur Andersen knew no later than
10  April 25, 2000, that Berkman was misrepresenting Fund assets and the use of Fund assets in
11  the Funds' internal bookkeeping records.

12                                         23.

13         Berkman transferred a total of $7,963,250 from the Funds to CB&A between mid-
14  1998 and the second quarter 2000 for the purported purpose of purchasing Preview Systems
15  stock. But Berkman used only $4,596,175 for that purpose, and made these purchases on the
16  open market at the height of Preview Systems' Initial Public Offering solely to conceal his
17  false statement about earlier Preview Systems purchases. Berkman kept the remaining
18  $3,367,075 for himself.

19                                         24.

20         Berkman reported to the Funds' members that more than $3 million he withdrew from
21  the Funds was used to purchase stock in Preview Systems before that company's IPO. But
22  Berkman made only $200,000 of pre-IPO purchases. Berkman and Arthur Andersen hid that
23  fact through a series of loans, transactions, and journal entries among the Funds, including by
24  listing 77,000 shares in Preview Systems as Fund assets when in fact he owned those shares
25  personally. Berkman did this to conceal the scope of his wrongful acts through the phantom
26  purchases. Then, in a further effort to conceal the misappropriation (and avoid repaying the

Page 10–  THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1  money he had taken), Berkman ultimately wrote off the entire Preview Systems investment
2  as worthless, and failed to return the stock's residual value to the Funds.

3                                      25.

4       In mid-2000, Arthur Andersen learned that Berkman misrepresented the Preview
5  Systems purchases in response to Arthur Andersen's April 25, 2000, inquiry and/or Arthur
6  Andersen reclassified the transfers to CB&A as a "short term note receivable" on Fund II's
7  books. Arthur Andersen concealed its knowledge from the Fund members and issued a
8  compilation report as of June 30, 2000, containing this reclassification.

9                                      26.

10      Berkman's bookkeeper, a former Arthur Andersen employee, sent Arthur Andersen a
11 memorandum dated March 10, 2001, confirming that Berkman had misrepresented the
12 Preview Systems purchase.

13                                     27.

14      After Arthur Andersen received the March 10, 2001 memorandum, Arthur Andersen
15 prepared a year-end 2000 compilation report and financial statements for Fund II. One
16 version of that report listed a $5,130,194 "Short-Term Note Receivable from [CB&A]". A
17 second version of the year-end 2000 compilation report, the version received by Fund II's
18 members, listed a $5,130,194 "Short-Term Note Receivable". The reports were addressed to
19 Fund II's members, but distributed by Berkman (who Hawkins and Arthur Andersen knew
20 had acted improperly with respect to other financial transactions, including the Funds).

21                                     28.

22      Berkman's bookkeeper also informed Arthur Andersen—through an April 2, 2001,
23 memorandum—that Berkman misrepresented Fund II's capitalization. The memorandum
24 reveals that Berkman issued 11 membership units in the amount of $1.375 million to satisfy
25 debt owed by Berkman and/or CB&A, and that no assets were received for those 11 units.
26 Arthur Andersen failed to disclose this information and instead classified the

Page 11— THIRD AMENDED COMPLAINT

1 misappropriation as an asset in the form of a "loan" to Berkman in the Funds' financial

2 statements.

29.

4 Richard Hawkins left Arthur Andersen in or about 2001, and became a shareholder in

5 the Geffen Mesher accounting firm. Hawkins, through his work with Arthur Andersen, was

6 aware that Berkman had engaged in the misconduct described above.

30.

8 The Funds hired Hawkins and Geffen Mesher to prepare tax returns, financial

9 statements, and compilation reports for year-end 2001. Geffen Mesher and Hawkins also

10 performed accounting services for other Berkman-affiliated companies.

31.

12 Geffen Mesher prepared a year-end 2001 compilation report and financial statements

13 for Fund II. One version of that report listed a $3,924,855 "Short-Term Note Receivable

14 from [CB&A]." A second version of the year-end 2001 compilation report, the version

15 received by Fund II's members, listed a $3,924,855 "Short-Term Note Receivable Due from

16 Montgomery Street Asset Management" (a company Berkman created in 2001). In fact,

17 there was no short-term note receivable from Montgomery Street; instead, this was money

18 Berkman had improperly taken from Fund II. The financial statement received by the

19 members concealed this fact. The reports were addressed to Fund II's members, but

20 distributed by Berkman (who Hawkins knew had acted improperly with respect to other

21 financial transactions including the Funds).

32.

23 In the spring or summer of 2002, a bcIMC representative requested that an

24 independent certified public accounting firm audit Funds I and II's financial statements. On

25 or before August 6, 2002, the Funds hired Geffen Mesher and Hawkins to perform the

26 requested audit.

Page 12 -- THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

33.

On October 24, 2002, Berkman told bcIMC: "In talking with the auditors, I learned that a key member of the audit team was taken away from the office for three weeks due to a family emergency, therefore the audit has been delayed. The individual in question has returned and I expect the audit to be completed shortly. When it is completed, it will be transmitted to you."

34.

On December 5, 2002, Berkman told bcIMC that he was encouraging the auditors to complete their work as soon as possible.

35.

Concurrent with Berkman's statements, bcIMC was receiving similar assurances from Geffen Mesher and Hawkins. On November 22, 2002, Hawkins wrote to bcIMC that the audits of the Funds' financial statements were progressing. In that communication, Hawkins said that he understood that bcIMC was the primary user of the Funds' financial statements and suggested the audit be deferred to years' end. In response, bcIMC rejected Hawkins's suggestion that the audit be delayed and reiterated that it should be through October 31, 2002, and that the audited financial statements should be provided to bcIMC at the earliest opportunity. bcIMC explained that a later audit could cover year-end.

36.

On December 6, 2002, Geffen Mesher sent a formal audit engagement letter to the Funds, through Berkman, notwithstanding Berkman, Geffen Mesher, and Hawkins's representations that the engagement had been underway for at least six months.

37.

On December 18, 2002, having heard nothing from Geffen Mesher since November 22, 2002, bcIMC asked Hawkins for a progress report and expectations as to completion. bcIMC also requested a draft of the audited financial statements. Hawkins responded six

Page 13– THIRD AMENDED COMPLAINT

1　days later stating that Geffen Mesher was currently working on the audit and planned to

2　finish it by the second half of January 2003.

3　　　　　　　　　　　　　　　　　38.

4　　　　　On February 10, 2003, bcIMC asked Hawkins for an audit progress report. Hawkins

5　responded two days later, and said that Geffen Mesher planned to have a draft copy of the

6　audited financial statements completed by March 15, 2003. On March 14, 2003, Hawkins

7　told bcIMC that the audit would not be completed by March 15, and did not provide a new

8　estimated completion date.

9　　　　　　　　　　　　　　　　　39.

10　　　　　On April 8, 2003, bcIMC asked Hawkins for progress, results, or a draft. On April

11　17, 2003, Berkman sent Hawkins an e-mail asking Hawkins to draft a proposed letter for

12　Berkman to send to bcIMC. Geffen Mesher drafted a letter for Berkman the next day, which

13　suggested that Berkman was working with Geffen Mesher to resolve and finalize the

14　following issues: "Certain audit test procedures regarding various investment transactions

15　that occurred during the period under audit; . . . Final reconciliations and documentation of

16　investments held by each entity; Preparation and review of the financial statements and

17　footnotes for the funds." The letter also suggested telling bcIMC that a draft was anticipated

18　by May 19, 2003.

19　　　　　　　　　　　　　　　　　40.

20　　　　　In fact, Geffen Mesher's audit notes from March 28, 2003, showed that Geffen

21　Mesher was questioning security transfers without payment, questioning the valuation of

22　certain assets, raising issues with respect to satisfaction of debts owed by Berkman, directing

23　that the auditors meet with the Funds' attorney regarding investments and transfers between

24　the Funds, noting that the financial statements improperly show payment of Berkman-related

25　debt with securities from one of the Funds, raising issues with respect to the worthlessness of

26　items and justification of payment of Berkman-related debt with "worthless securities," and

Page 14–  THIRD AMENDED COMPLAINT

1  raising the need to address the legal aspects of securities transfers represented as payment of

2  Berkman-related debt.

41.

4      Geffen Mesher failed to disclose any of their findings to bcIMC, the Advisory

5  Committee (a subgroup of certain members who had power to approve/disapprove

6  transactions involving conflicts of interest), or any of the Funds' members. Instead, Hawkins

7  drafted a letter to Berkman—dated April 4, 2003—that raised concerns about a $3,628,000

8  loan from Funds I and II to CB&A that was subsequently loaned to Berkman by CB&A. The

9  letter said, "In our procedures, we have observed transactions which we believe are not

10  appropriate to reduce the amount owed." The letter included a "not necessarily all-inclusive"

11  list of inappropriate transactions.

42.

13      The April 4, 2003, letter then referred to conflicts of interest between CB&A, the

14  managing member, and the Funds with regard to "numerous transfers of investments and

15  investors between funds."

43.

17      The April 4, 2003, letter also said that Geffen Mesher had requested but not received

18  evidence that the Advisory Committee exists, that it was active, and had approved the

19  related-party transactions described in the letter. Geffen Mesher's letter also stated that there

20  were several audit issues requiring special attention and cooperation from Berkman. Finally,

21  the letter made reference to unpaid fees for the engagement in the amount of $36,426.

44.

23      Geffen Mesher failed to disclose any of the information—from the March 28, 2003,

24  audit notes or the April 4, 2003, letter—to bcIMC, the Advisory Committees, or the Funds'

25  other investors even though bcIMC asked for a report on April 8, 2003. None of that

26  information was in the letter Geffen Mesher drafted and provided Berkman on April 18,

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1   2003, for the purpose of sending to bcIMC. Instead, Hawkins and another Geffen Mesher

2   shareholder met privately with Berkman on April 4, 2003, at the Heathman restaurant in

3   Portland, Oregon. A note on the letter indicates that the letter's contents were discussed.

4                                45.

5       Time records indicate that Hawkins spent two-and-a-half hours on March 27, 2003,

6   and March 28, 2003, discussing issues relating to the audit with Berkman. On April 7, 2003,

7   Hawkins's time entry for an hour-and-a-half says, "Meet with Craig one-on-one and discuss

8   the audit." Hawkins spent an additional hour on April 8, 2003, and another hour on April 9,

9   2003, on audit issues and a telephone conversation with Berkman regarding the audit. Those

10   six hours appear on the bill sent to the Funds—through Berkman—as a write-off.

11                                 46.

12       On April 29, 2003, Hawkins sent Berkman a letter referencing the April 7, 2003,

13   meeting stating that there was "an understanding that you [Berkman] would provide us

14   [Geffen Mesher] with: a letter describing specific items discussed and setting dates you

15   would provide the information; unpaid fees would be brought current on or near April 16,

16   2003. . . ." The letter goes on to say "we cannot continue to provide services to meet the

17   Fund's [sic] needs." A handwritten note by Hawkins on the copy of the letter says that

18   Geffen Mesher and Berkman "mutually agreed to part ways with respect to the audit."

19                                47.

20       The April 29, 2003, letter was not provided to bcIMC, the Advisory Committees, or

21   any of the other investors. Instead, with no communication after bcIMC's April 8, 2003,

22   inquiry, Hawkins wrote bcIMC on May 12, 2003, saying, "I know it has been some time

23   since your inquiry with respect to the status of the audit of [the Funds] for which I apologize.

24   This is to inform you that we are no longer engaged to perform the audit. Please direct any

25   inquiries to Craig. Best regards, Rick."

26

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

48.

All work done by Geffen Mesher (as outlined in the preceding paragraphs) was billed to the Funds and not to Berkman personally.

49.

Berkman sent bcIMC a letter dated May 9, 2003, which said, "After working with Geffen Mesher for more than five months, we became convinced that they were not committed to our deadlines or sensitive to their billing fees. During the elapsed time a number of unforeseen developments regarding the availability of their personnel, extremely high fees, and their unsupported approach with respect to the form of the audit report, have led us to conclude that another well-qualified firm should complete the audit." Berkman also said: "The completion of these audits is a very high priority for the Funds and continues to receive our undivided attention." The letter estimates the audits will be concluded "on or before June 30, 2003."

50.

During a phone conference with a bcIMC representative in 2003, Hawkins misrepresented the audit findings to conceal Berkman's improper conduct and to conceal Hawkins and Geffen Mesher's improper conduct. At no time did Hawkins or any other Geffen Mesher representative communicate with any member of Fund I, II, or III regarding its knowledge of Berkman's improper conduct or material errors contained in the Funds' financial statements and reports. Instead, Berkman, Geffen Mesher, and Hawkins actively concealed their respective activities.

51.

On May 27, 2003, Hawkins made the following statements to a bcIMC representative regarding the audit termination: (a) Berkman had decided to have his tax accountants perform the audit; (b) the audit was terminated because Berkman asked for a qualified opinion, but Geffen Mesher felt it was too late in the process to issue a qualified opinion and

Page 17 -- THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1 │ wanted to issue an unqualified opinion. Hawkins's statements on behalf of Geffen Mesher
2 │ concealed and failed to disclose information they knew and directly contradicted the terms of
3 │ Geffen Mesher's audit engagement letters that specifically said that Geffen Mesher's audit
4 │ opinion would be a "qualified" opinion.

5 │                                          52.

6 │         As discussed above, from the time the Funds first retained Geffen Mesher, and prior
7 │ to the audit engagements, Geffen Mesher and Hawkins knew or should have known of a
8 │ number of suspicious transactions involving CB&A, Berkman, and the Funds. During the
9 │ audit process itself, Geffen Mesher and Hawkins learned of a number of improper and
10 │ potentially fraudulent and/or illegal acts, including in-kind security transfers between Funds
11 │ without appropriate valuations, reclassification of transactions, satisfaction of debt of one
12 │ Fund to another Fund with worthless securities, suspicious satisfactions of CB&A debts with
13 │ transfers of worthless securities between the Funds and CB&A, suspicious transactions
14 │ between Berkman, CB&A, and the Funds, and unsupported journal entries.

15 │                                          53.

16 │         At no time did Geffen Mesher or Hawkins notify the Advisory Committees or any
17 │ Fund members regarding inappropriate transactions and errors contained in the financial
18 │ statements, which they had discovered, involving the use of Fund money.

19 │                                          54.

20 │         After the Geffen Mesher audit was terminated in May 2003, Berkman represented to
21 │ bcIMC that a new audit firm had been engaged to complete the Geffen Mesher audit.
22 │ Berkman represented that the newly engaged auditors would prepare an audit report shortly.

23 │                                          55.

24 │         In June 2003, bcIMC and certain other members of the Funds retained counsel to
25 │ investigate Berkman's activities as manager of the Funds. Counsel immediately requested
26 │ that Berkman provide all of the Funds' books and records pursuant to ORS 63.781(4). In

Page 18– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1   response, Berkman promised to produce the requested documents, did produce documents,
2   appeared to cooperate with requests for additional information, and affirmatively represented
3   that he had produced all of the requested documents. But the Funds' learned in May 2005
4   that he had not, in fact, complied with the Funds' document request. Instead, he concealed
5   the misconduct of all defendants.

6                                      56.

7       In September 2003, Berkman entered into an agreement confirming that he no longer
8   had authority to make additional investments with Fund assets without prior approval.

9                                      57.

10      In October 2003, certain members of the Funds, through counsel, retained a certified
11  fraud examiner to review the Funds' books and records Berkman provided.

12                                     58.

13      After being delayed by Berkman's apparent cooperation (that was really an act of
14  concealment), the fraud examiner issued a report in May 2004—concluding that there was
15  evidence of possible misconduct in Berkman's management of the Funds and recommending
16  further investigation.

17                                     59.

18      On December 7, 2004, the Funds replaced Berkman as their manager and hired a new
19  manager.

20                                     60.

21      On or about March 30, 2005, Berkman executed a tolling agreement in favor of the
22  Funds and Fund members so that the parties could conduct an investigation of Berkman's
23  management and administration of the Funds.

24                                     61.

25      In May 2005, the Funds confirmed through a review of previously concealed
26  documents that losses had occurred as a result of Berkman's misconduct, and that Arthur

Page 19– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1  Andersen and Geffen Mesher had been aware of and assisted in the concealment of

2  Berkman's and their own misconduct.

3                                        62.

4       On or about September 12, 2005, Geffen Mesher executed a tolling agreement in

5  favor of the Funds and Fund members so that the parties could conduct an investigation of

6  Geffen Mesher's work for the Funds and Fund members. Geffen Mesher refused to provide

7  documents to the Funds prior to May 2005, on the basis that the Funds owed Geffen Mesher

8  money.

9                                        63.

10      In October 2005, Arthur Andersen advised that documents would be provided to the

11 Funds only if the Funds and members agreed to release all claims against Arthur Andersen.

12                                       64.

13      As a result of the active concealment of misconduct by Berkman, Arthur Andersen,

14 Richard Hawkins and Geffen Mesher, neither the Funds nor the individual member plaintiffs

15 knew of the misconduct of defendants herein (or that the defendants' misconduct had caused

16 plaintiffs damage) until sometime after May 2005.

17                        **CASCADE VENTURE PARTNERS I AND**
                        **CASCADE ASSETS MANAGEMENT COMPANY**
18

19                                       65.

20      On May 26, 1999, Berkman caused Fund II to loan $500,000 to Cascade Venture

21 Partners I and/or Cascade Assets Management Company. The loan did not further the

22 business interests of Fund II. The loan was made as a favor to the Cascade entities and/or

23 their principal(s) for facilitating an earlier loan to Berkman and/or CB&A. As of

24 December 2, 2002, the amount owed to Fund II on the loan was $444,207.10 with accrued

25 interest in the amount of $227,040.28 plus $315.21 per diem. Berkman and/or CB&A

26 caused the Funds to spend $6,614.16 in costs and attorney's fees in attempt to collect on the

Page 20–  THIRD AMENDED COMPLAINT

**Bullivant|Houser|Bailey PC**

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1  loan. Berkman's personal use of Fund assets in this manner caused losses to the Funds in the

2  approximate amount of $1,089,525.70 plus $315.21 per day for each day after July 31, 2006.

3  **GEOTRUST**

4  66.

5  Berkman caused the Funds to make investments in GeoTrust. The Funds owned

6  Series A and B Preferred Shares. In addition, the Funds invested in Series C Shares.

7  67.

8  As a result of Berkman's misappropriation and mismanagement of Fund assets, the

9  Funds were unable to make prudent follow-on investments that had been committed

10  previously by Berkman because the Funds did not have sufficient cash.

11

12  68.

13  The failure to make prudent follow-on investments in the C and D rounds resulted in

14  the Funds losing their preferred shareholder status in the GeoTrust Series A and B shares and

15  caused the Funds' investments to be heavily diluted when the Series C Shares were split 10

16  to 1.

17  69.

18  In addition to the loss of preferred status in the GeoTrust Series A and B shares, and

19  the dilution in the Series C shares, the Funds lost a liquidation preference. Berkman's failure

20  to make prudent follow-on investments in the C and D rounds, together with the

21  misappropriation and mismanagement of Fund assets, deprived the Funds of participating in

22  the Series D round and, as a result, deprived the Funds of a greater liquidation preference.

23

24  70.

25  As a result of Berkman's improper conduct, the Funds invested approximately

26  $5,380,477 in GeoTrust, and suffered lost opportunity damages of at least $17 million.

Page 21– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

## SYNECTIC FUNDS IV AND V

71.

After forming the Funds, Berkman formed Synectic Ventures IV, LLC ("Fund IV")and Synectic Ventures V, LLC ("Fund V"). Berkman managed and controlled Funds IV and V at all material times.

72.

Between October 1, 2002, and July 3, 2003, Berkman transferred assets from the Funds to Fund IV in the approximate amount of $229,106. The transfers were without consideration to the Funds, were not prudent, and were not in the Funds' best interests. The transfers were made for Berkman's benefit, who put his interests ahead of those of the Funds and their members in making the transfers.

73.

Between March 7, 2001, and June 30, 2002, Berkman transferred $5,793,461 from the Funds to Fund V. The transfers were without consideration to the Funds, were not prudent, and were not in the Funds' best interests. The transfers were made for Berkman's benefit, who put his interests ahead of those of the Funds and their members in making the transfers.

74.

Funds IV and V subsequently paid the Funds $1,646,050. Thus, the Funds lost $3,476,517 as a result of Berkman's transfers to Funds IV and V because those Funds were without sufficient assets to repay the transfers.

Page 22– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

### FIRST CLAIM FOR RELIEF

**(Breach of Contract—The Funds and members v. Berkman,
SVM I, SVM II, SVM III, and CB&A)**

75.

The Funds and members reallege the preceding allegations.

76.

The operating agreement and management agreement for each Fund required Berkman to manage the Funds in a manner consistent with Oregon's LLC Act and Oregon law. Section 14.6 of each of the operating agreements states that the duties specified in those agreements were for the benefit of the Funds' members. Berkman therefore owed a special duty to the Funds' members.

77.

Specifically, Berkman owed the Funds' members the duty to:

a.     Manage the Funds in a lawful and appropriate manner (Section 4.4);

b.     Not possess or assign rights in the Funds' property other than for a fund purpose (Section 4.1);

c.     Invest the Funds' assets in non-marketable securities of companies for long-term gain (Section 2.1).

78.

SVM I, SVM II, and SVM III delegated the right to control some of the Funds' activities and administrative functions to CB&A.

79.

Berkman failed to manage the Funds in the manner required by the operating agreements, Oregon's LLC Act, and Oregon common law, in the following ways:

a.     By possessing and/or assigning rights in Fund property for Berkman's own purposes rather than Fund purposes;

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1       b.    By causing the Funds to incur debt for reasons other than Fund purposes;

2       c.    By taking money from the Funds under circumstances that provided a benefit

3   to Berkman and his companies and a detriment to the Funds;

4       d.    By failing to disclose and intentionally concealing material facts relating to

5   instances where Berkman and entities he controlled took Fund money;

6       e.    By causing the Funds to loan money to Funds IV and V, and engage in

7   transactions with Funds IV and V, when the interests of those companies were adverse to the

8   interests of the Funds;

9       f.    By failing to disclose and by intentionally concealing material facts relating to

10  transactions involving Funds IV and V;

11      g.    By causing the Funds to accept securities of significantly lesser value as "in

12  kind" repayment of personal or related-party loans;

13      h.    By failing to disclose and by intentionally concealing material facts related to

14  "in kind" loan repayments;

15      i.    By making unsecured loans of the Funds' money;

16      j.    By failing to disclose and by intentionally concealing material facts related to

17  unsecured loans of the Funds' money;

18      k.    By failing to accurately report to the Funds' members regarding the Funds'

19  status and condition;

20      l.    By generating and distributing reports that misrepresented the Funds' financial

21  condition;

22      m.    By utilizing improper accounting methods to conceal the Funds' financial

23  condition;

24      n.    By concealing transactions relating to the transfer and use of Fund money;

25      o.    By making or causing to have been made unsupported adjusting journal entries

26  in the Funds' financial records with the intent of misstating the Funds' financial position and

Page 24–  THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1  circumstances;

2      p.    By intermingling the Funds' assets;

3      q.    By falsifying investment records where no investments were made and taking

4  the Funds' money for himself; and

5      r.    By generally failing to uphold fiduciary duties owed to the Funds, including

6  but not limited to the duty to act in good faith, the duty to act with the care an ordinarily

7  prudent person in a like position would exercise under similar circumstances and in a manner

8  the manager reasonably believes to be in the best interests of the Funds, and the duty to hold

9  as trustee any benefit or profits derived from the use of the Funds' money.

10                                    80.

11     Berkman breached obligations he owed pursuant to the operating agreements and

12  Oregon law in the particulars set forth above.

13                                    81.

14     If the Funds are required to satisfy conditions to establish or bring claims, those

15  conditions have been satisfied.

16                                    82.

17     As a direct, substantial and proximate result of Berkman's actions, the Funds

18  sustained damages as stated below.

19                                    83.

20     The operating agreements allow for reasonable attorney fees to the prevailing party in

21  any action involving the interpretation of the operating agreements. To the extent the Funds

22  are deemed prevailing parties, they are entitled to their reasonable attorney fees.

23              **SECOND CLAIM FOR RELIEF**

24     **(Breach of Contract—bcIMC v. Berkman, SVM I, SVM II, and CB&A)**

25                                    84.

26     bcIMC realleges the preceding allegations.

Page 25– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

85.

2    bcIMC is a wholly-owned subsidiary of the Province of British Columbia, Canada.
3  Pursuant to certain mandates prescribed by the laws of British Columbia, bcIMC provides
4  professional asset management services to public bodies and publicly administered trust
5  funds in British Columbia. Public-sector pension plans, established for the benefit of British
6  Columbia public employees, constitute bcIMC's largest client group.

86.

8    bcIMC is a party to the operating agreements for Funds I and II and owns a majority
9  of the membership units of the two limited liability companies constituting those funds.
10  Pursuant to Section 4.6 of each of those agreements, bcIMC was entitled to be on the
11  Advisory Committees for Funds I and II. The Advisory Committees were to provide certain
12  oversight to Funds I and II. Under the terms of the operating agreements, SVM I and SVM
13  II are the Managing Members of Funds I and II, respectively. SVM I and SVM II are also
14  party to the operating agreements.

15    87.

16    SVM I and SVM II each delegated to CB&A the obligation to perform various
17  investment activities and administrative functions for which SVM I and SVM II were
18  responsible under the operating agreements. CB&A, in turn, delegated some of those duties
19  to Craig Berkman, who was an officer of SVM I, SVM II, and CB&A. Craig Berkman and
20  CB&A knew and understood that SVM I and SVM II owed duties to bcIMC under the
21  various agreements, and undertook to perform those duties on behalf of SVM I and SVM II
22  in discharge of those duties. The Fund II operating agreement (section 7.2) specifically
23  contemplates the retention of CB&A to perform management services for the benefit of that
24  Fund and its members.

25    88.

26    The operating agreements for Funds I and II required SVM I and SVM II to manage

Page 26- THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1 Funds I and II in a manner consistent with Oregon's LLC Act. Through the operating
2 agreements, SVM I and SVM II provided a direct warranty to bcIMC that Funds I and II
3 would be managed in such lawful and appropriate manner. Section 4.4 of each operating
4 agreement says, "The Managing Member warrants and covenants with the Company and
5 each of the Members, jointly and severally, to carry out its duties in accordance with the
6 standard of conduct specified for managers of limited liability companies as set forth in
7 [Oregon's LLC Act]."

8                                          89.

9      Section 4.1(b) of each operating agreement prohibited Berkman from, among other
10 things, "possess[ing] Company property or assign[ing] rights in specific Company property
11 other than for a Company purpose."

12                                         90.

13      Section 2.1 of the operating agreements required that the Funds' assets be invested in
14 companies for long-term capital appreciation and prohibited substantial investments in non-
15 marketable securities without the approval of the Advisory Committees.

16                                         91.

17      Section 14.6 of each of the operating agreements provides that the duties specified in
18 those agreements were intended to benefit the members.

19                                         92.

20      Pursuant to the terms of those operating agreements, bcIMC contributed a total of $51
21 million in capitalization to Funds I and II between January 4, 1999, and June 5, 2000, bcIMC
22 made those investments for the benefit of various British Columbia public-sector pension
23 plans and funds.

24                                         93.

25      In addition to the terms of the operating agreements, on or before June 30, 1999,
26 Berkman agreed with bcIMC that Berkman would cause Funds I and II to provide bcIMC

Page 27–  THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1 with annual audited financial statements within ninety (90) days of the end of each fund's
2 fiscal year. This special obligation or duty, owed only to bcIMC (i.e., this duty was not owed
3 to other members of Funds I and II), was to begin in the year ending December 31, 1999, and
4 continue each year after. This agreement was memorialized in a June 30, 1999, letter from
5 Berkman to bcIMC.

6                                        94.

7        In agreeing that Funds I and II would provide bcIMC with audited financial
8 statements, Berkman expressly or impliedly agreed that such audited financial statements
9 would be accurate and complete in all material respects, that he would act in good faith with
10 respect to bcIMC's reasonable inquires about such audited financial statements and the
11 process and status of their preparation, and that he would notify bcIMC of any material
12 problems associated with their preparation.

13                                       95.

14       Berkman failed to manage Funds I and II in the manner required by the operating
15 agreements, in the manner required by the special audit agreement with bcIMC, and
16 breached those agreements in the various ways alleged above. In addition, Berkman
17 breached his agreements with bcIMC in the following ways:

18       a.      By failing to cause Funds I and II to provide bcIMC audited financial
19 statements for Funds I and II, as agreed by the parties, and by taking various actions designed
20 to interfere with and delay the performance and delivery of audited financial statements to
21 bcIMC by one or more professional accounting firms retained for that purpose;

22       b.      By making false statements to bcIMC in 2001 and 2002, and in response to
23 direct inquiries by bcIMC, about the status of the Geffen Mesher audit review and the
24 reasons Geffen Mesher terminated its work on the audits;

25       c.      By possessing and/or assigning rights in Fund property for Berkman's own
26 purposes rather than Fund purposes;

Page 28– THIRD AMENDED COMPLAINT

1      d.     By causing Funds I and II to incur debt for reasons other than Fund purposes;

2      e.     By allowing Berkman and entities he controlled to divert assets of Funds I and

3 II to himself;

4      f.     By failing to disclose and intentionally concealing material facts relating to

5 instances where Berkman and entities he controlled took money belonging to Funds I and II;

6      g.     By causing Funds I and II to loan money to Funds IV and V, and engage in

7 transactions with Funds IV and V, when the interests of those companies were adverse to

8 Fund I and II's interests;

9      h.     By causing Fund I and/or Fund II to expend substantial resources on the

10 purchase, or purported purchase, of marketable securities without the consent of the

11 Advisory Committee;

12      i.     By causing Funds I and II to accept securities of significantly lesser value as

13 "in kind" repayment of personal or related-party loans;

14      j.     By making unsecured loans of monies belonging to Funds I and II;

15      k.     By failing to disclose and by intentionally concealing material facts relating to

16 unsecured loans of monies belonging to Funds I and II;

17      l.     By engaging in investments that were not consistent with the stated investment

18 objectives of Funds I and II;

19      m.     By failing to reasonably report to beIMC regarding the status and condition of

20 Funds I and II;

21      n.     By generating and distributing compilations, financial statements and other

22 reports to beIMC that misrepresented the financial condition of Funds I and II;

23      o.     By utilizing improper accounting methods to conceal the true financial

24 condition of Funds I and II;

25      p.     By concealing transactions relating to the transfer and use of monies belonging

26 to Funds I and II;

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1     q.     By making or causing to have made unsupported adjusting journal entries in

2  the books and records of Funds I and II with the intent of misstating those Funds' financial

3  position and circumstances;

4     r.     By intermingling assets of the Funds I and II with other Berkman-managed

5  funds;

6     s.     By personally profiting from transactions with Funds I and II without

7  disclosing actual conflicts of interest to bcIMC; and

8     t.     By generally failing to uphold the fiduciary duties owed to bcIMC, including

9  but not limited to the duty to act in good faith (which duty is implied by contract and

10  imposed by ORS 63.155(4) and/or ORS 63.155(9)(b)), the duty to act with the care an

11  ordinarily prudent person in a like position would exercise under similar circumstances and

12  in a manner the manager reasonably believes to be in the best interests of bcIMC, and the

13  duty to hold as trustee any benefit or profits derived from the use of bcIMC's money.

96.

15     Berkman breached their obligations owed pursuant to the agreements discussed above

16  and Oregon law in the particulars set forth above.

97.

18     To the extent bcIMC is required to satisfy conditions to establish or bring claims

19  based on breach of contract, those conditions have been satisfied.

98.

21     As a direct, substantial and proximate result of Berkman's contract breaches, bcIMC

22  sustained damages as stated below.

99.

24     Section 14.9 of the operating agreements for Funds I and II provides for an award of

25  reasonable attorney fees in any action involving the enforcement or interpretation of these

26  agreements. bcIMC is entitled to its reasonable attorney fees, along with all reasonable costs

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1 | and disbursements.

2 | ### THIRD CLAIM FOR RELIEF

3 | **(Breach of Implied Covenant of Good Faith and Fair
Dealing—The Funds and members v. Berkman, SVM I,
4 | SVM II, SVM III, and CB&A)**

5 | 100.

6 | The Funds and members reallege the preceding allegations.

7 | 101.

8 | The covenant of good faith and fair dealing is implied into the agreements between

9 | the Funds and Berkman, and is intended to protect the Funds and members' reasonable

10 | contract expectations.

11 | 102.

12 | The Funds and members reasonably expected that Berkman would deal fairly with

13 | them and not place his own interests above those of the Funds and members. But Berkman,

14 | by his conduct described above, did not deal fairly with the Funds and members and instead

15 | acted in his own interests to the detriment of the Funds and members. In so doing, Berkman

16 | breached the implied covenant of good faith and fair dealing.

17 | 103.

18 | As a direct, substantial and proximate result of Berkman's actions, the Funds and

19 | members sustained damages as stated below.

20 | ### FOURTH CLAIM FOR RELIEF

21 | **(Breach of Fiduciary Duty—The Funds and members v.
Berkman, SVM I, SVM II, SVM III, and CB&A)**
22 |

23 | 104.

24 | The Funds and members reallege the preceding allegations.

25 | 105.

26 | Berkman agreed to provide management services to the Funds pursuant to the

Page 31– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1    operating agreements. The nature of these relationships gave rise to common law duties on
2    the part of Berkman to act with due care, to avoid conflicts of interest, to act in the best
3    interests of the Funds and members, to act with loyalty toward the Funds and members, and
4    to make full disclosures of all material information to the Funds and members.

5                                                    106.

6           Berkman breached common law fiduciary duties he owed to the Funds by failing to
7    act with due care, by placing his own interests and those of other entities he controlled ahead
8    of the best interests of the Funds and members, by failing to identify and disclose conflicts of
9    interest, by failing to act with loyalty toward the Funds and members, and by failing to make
10   full disclosures of all material information to the Funds and members.

11                                                   107.

12          SVM I, SVM II, and SVM III each delegated the right to control some of the
13   activities and administrative functions of the Funds to CB&A.

14                                                   108.

15          Berkman, SVM I, and CB&A were in a fiduciary relationship with Fund I and its
16   members by virtue of their control over that Fund's assets, and had responsibility to exercise
17   independent judgment to act in the best economic interests of Fund I and its members. Fund
18   I and its members had a right to rely on Berkman, SVM I, and CB&A, and did in fact rely on
19   Berkman, SVM I, and CB&A to exercise independent judgment in furtherance of their
20   economic interests.

21                                                   109.

22          Berkman, SVM II, and CB&A were in a fiduciary relationship with Fund II and its
23   members by virtue of their control over that Fund's assets and had responsibility to exercise
24   independent judgment to act in the best economic interests of Fund II and its members. Fund
25   II and its members had a right to rely on Berkman, SVM II, and CB&A, and did in fact rely
26   on Berkman, SVM II, and CB&A to exercise independent judgment in furtherance of their

Page 32    THIRD AMENDED COMPLAINT                                    Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1  economic interests.

2  110.

3  Berkman, SVM III, and CB&A were in a fiduciary relationship with Fund III and its
4  members by virtue of their control over that Fund's assets, and had responsibility to exercise
5  independent judgment to act in the best economic interests of Fund III and its members.
6  Fund III and its members had a right to rely on Berkman, SVM III, and CB&A, and did in
7  fact rely on Berkman, SVM III, and CB&A to exercise independent judgment in furtherance
8  of their economic interests.

9  111.

10  Berkman failed to exercise independent judgment in furtherance of the Funds and
11  members' economic interests; instead, he acted to further their own interests to the detriment
12  of the Funds and members in the following ways:

13  a.  By causing the Funds to incur debt for reasons other than Fund purposes;

14  b.  By allowing Berkman and entities he controlled to take money from the Funds
15  under circumstances that provided a benefit to Berkman and his companies and a detriment
16  to the Funds;

17  c.  By failing to disclose and by intentionally concealing material facts related to
18  instances where Berkman and entities he controlled took Fund money;

19  d.  By causing the Funds to loan money to Funds IV and V, and to engage in
20  transactions with Funds IV and V, when the interests of those companies were adverse to the
21  Funds' interests;

22  e.  By failing to disclose and by intentionally concealing material facts relating to
23  transactions involving Funds IV and V;

24  f.  By causing the Funds to accept securities of significantly lesser value as "in
25  kind" repayment of personal or related party loans;

26  g.  By failing to disclose and by intentionally concealing material facts relating to

Page 33– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1  "in kind" loan repayments;

2      h.    By making unsecured loans of the Funds' money;

3      i.    By failing to disclose and by intentionally concealing material facts related to

4  unsecured loans of the Funds' money;

5      j.    By engaging in investments that were not consistent with the Funds' stated

6  investment objectives;

7      k.    By misrepresenting to members the Funds' status and condition;

8      l.    By generating and distributing reports that misrepresented the Funds' financial

9  condition;

10     m.    By utilizing improper accounting methods to conceal the Funds' true financial

11  condition;

12     n.    By misrepresenting transactions relating to the transfer and use of Fund

13  money;

14     o.    By making or causing to be made unsupported adjusting journal entries in the

15  Funds' financial records with the intent of misstating the Funds' financial position and

16  circumstances;

17     p.    By intermingling the Funds' assets;

18     q.    By personally profiting from transactions with the Funds;

19     r.    By misstating investment records where no investments were made and

20  keeping the money for himself;

21     s.    By failing to disclose the Funds' documents when requested to do so;

22     t.    By creating reports regarding the Funds' financial condition which were

23  inaccurate;

24     u.    By creating Advisory Committee meeting minute records which were

25  inaccurate;

26     v.    By creating loan documents which were inaccurate;

Page 34 - THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1    w.    By providing information to the Funds' members about the reasons for their
2    losses which he knew was not accurate;

3    x.    By creating accounting records which concealed the Funds' true financial
4    condition; and

5    y.    By misrepresenting transactions relating to the transfer and use of Fund
6    money.

7                                    112.

8        By engaging in the conduct described in the preceding paragraph, Berkman failed to
9    uphold fiduciary duties he owed the Funds, including the duty to act in good faith, the duty to
10   act with the care an ordinarily prudent person in a like position would exercise under similar
11   circumstances and in a manner the manager reasonably believes to be in the best interests of
12   the Funds, and the duty to hold as trustee any benefit or profits derived from the use of the
13   Funds' money. One example of Berkman's breach of fiduciary duty concerned the Preview
14   Systems transaction:

15   a.    Between December 8, 1999, and May 2000, Berkman and/or CB&A
16   purchased $4,396,175 of publicly traded Preview Systems stock at per share prices that
17   ranged from $62.75 to $13.50 in an effort to conceal the fact that Berkman had not made the
18   investments of the Funds' assets in Preview Systems as reported in the Funds' financial
19   statements. The Funds' average share purchase price was $24.02.

20   b.    By the second quarter of 2000, Berkman had transferred $7,963,250 to CB&A
21   for the purported purpose of purchasing Preview Systems stock. According to the brokerage
22   records, Berkman purchased $4,396,175 worth of Preview stock in the name of Fund II,
23   making all or most of the purchases after Preview's initial public offering in order to conceal
24   his prior misappropriation. In addition, certificates for stock purchases (29,762 shares of
25   Series G that were purchased prior to the December 1999 IPO) in the amount of $100,000
26   each exist for Funds I and II (even though the investor reports attribute the investment to

Page 35– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1 | Fund III).

2 |     c.     In addition to the foregoing, Berkman personally purchased 77,739 shares of

3 | Preview Systems stock in his own name. In the second quarter 2000 report, Berkman

4 | represented to the investors that those 77,739 shares were part of Fund II's investment.

5 |     d.     By May 2000, Preview Systems stock was trading at $10.63 per share. By the

6 | third quarter 2000 investor report, Berkman had completely written off the Preview Systems

7 | investment as a total loss for Fund II. Berkman's records show that he tried to further

8 | conceal his misappropriation of Fund money by manipulating the Funds' investments in the

9 | reports to members. Fund III's accounting records for the second quarter of 2000 state

10 | Berkman had invested $7,963,250 in Preview Systems. Those records conflict with the Fund

11 | III investors' report for that period. The portfolio listing in the investors' report states that

12 | Fund III's total investment in Preview System stock was only $100,000. At a different place

13 | in the report, there is a notation that Fund III made or held an additional $5,406,652

14 | investment in Preview Systems stock.

15 |     e.     Fund II reports were also misleading. Although the accounting records for

16 | Fund II show no investment in Preview Systems, the Fund II investors' report for that period

17 | says that Fund II owned $4,629,362 of Preview Systems stock.

18 |     f.     At the time Berkman wrote off Fund II's Preview Systems investment as a

19 | complete loss in November 2000, the stock had residual value of $3 per share, or

20 | approximately $550,000. None of the residual value was realized by any of the Funds.

21 |                                            113.

22 |     As a direct, substantial and proximate result of Berkman's actions, the Funds and

23 | members sustained damages as stated below.

24 |

25 |

26 |

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

# FIFTH CLAIM FOR RELIEF

## (Breach of Fiduciary Duty—bcIMC v. Berkman, SVM I, SVM II, and CB&A)

114.

bcIMC realleges the preceding allegations.

115.

Pursuant to the management and operating agreements relating to Funds I and II, Berkman, SVM I, SVM II, and CB&A had responsibility to exercise independent judgment to act in bcIMC's economic interests. By virtue of those agreements, Berkman, SVM I, SVM II, and CB&A had control over funds entrusted to their care by bcIMC. bcIMC had a right to rely on these individuals, and did in fact rely on them to exercise independent judgment in furtherance of bcIMC's economic interests.

116.

By and through the various operating and management agreements, Berkman, SVM I, SVM II, and CB&A agreed to provide professional investment services to bcIMC or for bcIMC's benefit. The nature of these relationships gave rise to duties on the part of Berkman, SVM I, SVM II, and CB&A to act with due care, avoid conflicts of interest, act in the best interests of bcIMC, act with loyalty toward bcIMC, and to make full disclosures of all material information to bcIMC.

117.

As a result of the foregoing, Berkman, SVM I, SVM II, and CB&A were in a fiduciary relationship with bcIMC.

118.

Berkman, SVM I, SVM II, and CB&A breached fiduciary duties they owed bcIMC by failing to act with due care, by acting in their own interests as opposed to the best interests of bcIMC, by failing to identify and disclose conflicts of interest to bcIMC or the Advisory

Page 37– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1 | Committees, by failing to act with loyalty toward bcIMC and Funds I and II, by

2 | misrepresenting the status and condition of Fund investments through reports and other

3 | documents and information they provided to bcIMC, by engaging in and concealing

4 | inappropriate transactions, and by failing to make full disclosures of all material information

5 | to bcIMC and the Funds, as alleged with particularity above.

119.

7 | Berkman also breached his fiduciary duty in the following particulars:

8 | a. He created and/or delivered to bcIMC inaccurate and misleading financial

9 | statements, Quarterly Reports, letters and documentation between 1999 and 2004 for the

10 | purpose of creating the illusion that Berkman was making proper investments with

11 | investment monies entrusted by bcIMC;

12 | b. He delivered to bcIMC financial compilations and reports for years (or periods

13 | within) 1998, 1999, 2000, and 2001 prepared by Geffen Mesher and Arthur Andersen, as the

14 | case may be, knowing that they materially misrepresented the financial condition of Funds I

15 | and II;

16 | c. He knowingly made various inaccurate statements to bcIMC in 2002 and

17 | 2003, and in response to direct inquiries by bcIMC, about the status of the Geffen Mesher

18 | audit review and the reasons Geffen Mesher terminated its work on the audits, including (for

19 | example): his known misstatements to bcIMC on May 9, 2003, that the Geffen Mesher

20 | audit was terminated because of "extremely high fees" and an "unsupported approach" to the

21 | audit; and his known misstatement to the Auditor General of British Columbia on May 9,

22 | 2003, that the audit was terminated because the auditors were not performing in a "timely

23 | and economical fashion.";

24 | d. He misrepresented material facts from bcIMC relating to instances where

25 | Berkman and entities he controlled took Fund money, including (for example) his

26 | misrepresentations to a bcIMC representative that a "short term note receivable" that bcIMC

Page 38– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1  had been told was owing to Fund II by a company called "Montgomery Street Asset

2  Management" was an "arm's length transaction" when, in fact, Berkman owned and

3  controlled that entity and the purported note misrepresented material facts;

4      e.      He used improper accounting methods to misrepresent the true financial

5  condition of Funds I and II; and

6      f.      He failed to disclose and misrepresented material facts related to transactions

7  involving Funds IV and V;

8      g.      He failed to disclose and misrepresented material facts related to "in-kind"

9  loan repayments;

10     h.      He failed to disclose and misrepresented material facts related to unsecured

11  and undocumented loans involving Funds I and II;

12     i.      He created inaccurate and misleading Advisory Committee meeting minute

13  records;

14     j.      He created inaccurate loan documents;

15     k.      He misrepresented information to bcIMC about the reasons for losses suffered

16  by Funds I and II;

17     l.      He created inaccurate accounting records to conceal the true financial

18  condition of Funds I and II and misrepresent his self-dealings;

19     m.      He misrepresented transactions relating to the transfer and use of investment

20  monies; and

21     n.      He failed to cause Funds I and II to provide audited financial statements as

22  agreed.

23                                          120.

24      None of the acts or omissions set forth in the preceding paragraphs were known by

25  bcIMC, nor could reasonably have been discovered by bcIMC, more than two years before

26  Berkman signed an agreement tolling the statute of limitations in March 2005.

Page 39– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1          121.

2          As a direct result of the actions of Berkman, SVM I, SVM II, SVM III, and CB&A,

3     bcIMC has sustained damages as stated below.

4          **SIXTH CLAIM FOR RELIEF**

5          **(Negligence/Negligent Misrepresentation—The Funds and**
           **members v. Berkman, SVM I, SVM II, SVM III, and**
6          **CB&A)**

7          122.

8     The Funds and members reallege the preceding allegations.

9

10         123.

11    Berkman owed duties to the Funds and members to act in a reasonably prudent

      manner as investment fund managers in the same or similar circumstances would act.
12
           124.
13
      Berkman had special relationships with the Funds and members, had authority to
14
      exercise independent judgment on behalf of the Funds and members, and owed duties to the
15
      Funds and members to act in their economic interests.
16
           125.
17
      SVM I, SVM II, and SVM III each delegated the right to control some of the Funds'
18
      activities and administrative functions to CB&A.
19
           126.
20
      Berkman, SVM I, and CB&A were in a special relationship with Fund I and its
21
      members by virtue of their control over that Fund's assets, and had responsibility to exercise
22
      independent judgment to act in their best economic interests. Fund I and its members had a
23
      right to rely on Berkman, SVM I, and CB&A, and did in fact rely on Berkman, SVM I, and
24
      CB&A to exercise independent judgment in furtherance of their economic interests.
25

26

Page 40– THIRD AMENDED COMPLAINT

127.

Berkman, SVM II, and CB&A were in a special relationship with Fund II and its members by virtue of their control over that Fund's assets and had responsibility to exercise independent judgment to act in their best economic interests. Fund II and its members had a right to rely on Berkman, SVM II, and CB&A, and did in fact rely on Berkman, SVM II, and CB&A to exercise independent judgment in furtherance of their economic interests.

128.

Berkman, SVM III, and CB&A were in a special relationship with Fund III and its members by virtue of their control over that Fund's assets, and had responsibility to exercise independent judgment to act in their best economic interests. Fund III and its members had a right to rely on Berkman, SVM III, and CB&A, and did in fact rely on Berkman, SVM III, and CB&A to exercise independent judgment in furtherance of their economic interests.

129.

Berkman failed to exercise his independent judgment in furtherance of the Funds and members' economic interests; instead, he acted in his own interests to the detriment of the Funds and members.

130.

Berkman failed to manage the Funds and members in the manner required of a reasonably prudent investment manager in the following ways:

    a.    By causing the Funds to incur debt for reasons other than Fund purposes;

    b.    By allowing Berkman and entities he controlled to take money from the Funds under circumstances that provided a benefit to Berkman and his companies and a detriment to the Funds;

    c.    By failing to disclose and by misrepresenting material facts related to instances where Berkman and entities he controlled took Fund money;

    d.    By causing the Funds to loan money to Funds IV and V, and engage in

Page 41– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1 | transactions with Funds IV and V, when the interests of those companies were adverse to the
2 | interests of the Funds;

3 |     e.    By failing to disclose and by misrepresenting material facts related to
4 | transactions involving Funds IV and V;

5 |     f.    By causing the Funds to accept securities of significantly lesser value as "in
6 | kind" repayment of personal or related party loans;

7 |     g.    By failing to disclose and by misrepresenting material facts related to "in
8 | kind" loan repayments;

9 |     h.    By engaging in investments that were not consistent with the stated investment
10 | objectives of the Funds;

11 |     i.    By failing to reasonably report to members regarding the status and condition
12 | of the Funds;

13 |     j.    By generating and distributing reports that misrepresented the Funds' financial
14 | condition;

15 |     k.    By utilizing improper accounting methods to misrepresent the Funds' true
16 | financial condition;

17 |     l.    By misrepresenting transactions relating to the transfer and use of Fund
18 | money;

19 |     m.    By making or causing to be made unsupported adjusting journal entries in the
20 | Funds' financial records which misrepresented the Funds' financial position and
21 | circumstances;

22 |     n.    By intermingling the Funds' assets;

23 |     o.    By personally profiting from transactions with the Funds;

24 |     p.    By creating inaccurate investment records where no investments were made
25 | and keeping the money for himself; and

26 |     q.    By generally failing to hold as trustee any benefit or profits derived from the

Page 42 -- THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.778.6351
Facsimile: 503.295.0915

1  use of the Funds' money.

2  131.

3  Berkman breached the standard of care owed to the Funds and members in the

4  particulars discussed above. Based on Berkman's reputation in the community, the Funds

5  and members reasonably relied on his misrepresentations to their detriment.

6  132.

7  As a direct result of Berkman's actions, the Funds and members sustained damages as

8  stated below.

9  **SEVENTH CLAIM FOR RELIEF**

10  **(Negligence—bcIMC v. Berkman, SVM I, SVM II and
   CB&A)**

11

12  133.

13  bcIMC realleges the preceding allegations.

14  134.

15  Berkman, SVM I, SVM II and CB&A owed duties to bcIMC to act in a reasonably

16  prudent manner as investment fund managers in the same or similar circumstances would act.

17  135.

18  Berkman, SVM I, SVM II and CB&A failed to exercise their independent judgment

19  in furtherance of bcIMC's economic interests; instead, they acted in their own interests to the

20  detriment of bcIMC and Funds I and II.

21  136.

22  Berkman, SVM I, SVM II and CB&A failed to manage Funds I and II, perform their

23  obligations under the operating and management agreements, and perform their obligations

24  under the audit agreement, in the manner required of a reasonably prudent investment

25  manager in the particulars alleged above.

26

Page 43– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

137.

None of the acts or omissions set forth in the preceding paragraphs were known by bclMC, nor could reasonably have been discovered by bclMC, more than two years before Berkman signed an agreement tolling the statute of limitations in March 2005.

138.

As a direct result of the negligence of Berkman, SVM I, SVM II and CB&A, bclMC sustained damages as stated below.

## EIGHTH CLAIM FOR RELIEF

### (Conversion—The Funds v. Berkman, SVM I, SVM II, SVM III, and CB&A)

139.

The Funds reallege the preceding allegations.

140.

Berkman represented to the Funds that their money would be used for investments in technology and medical industry regional startups that possessed the potential for long-term capital growth.

141.

Based on the above representations, the Funds' members entrusted and delivered money to Berkman.

142.

Berkman, through the use of his management companies and other related companies, converted the Funds' money for his personal use, without the Funds' knowledge or consent.

143.

Plaintiffs have not recovered approximately $65 million of the money delivered and entrusted to Berkman.

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

144.

As a direct result of Berkman's exercise of dominion and control over the Funds' money, they have been deprived of the use of money taken by Berkman beginning in December 1997 and through March 2000, have incurred costs and expenses in pursuing the return of the converted money, and have sustained other damages as stated below. The Funds assert a constructive trust as to all property held by Berkman which was obtained through his misappropriation of Fund assets.

## NINTH CLAIM FOR RELIEF

### (Negligent Misrepresentation—bcIMC v. Berkman, SVM I, SVM II and CB&A)

145.

bcIMC realleges the preceding allegations.

146.

bcIMC was in a fiduciary relationship with Berkman, SVM I, SVM II and CB&A, as alleged above.

147.

In his dealings with bcIMC between 1998 and 2004, Berkman made negligent misrepresentations to bcIMC in the following particulars:

a. By authoring and delivering to bcIMC inaccurate and misleading financial statements, Quarterly Reports, letters and documentation that appeared to the reasonable reader to suggest that Berkman was making proper investments with monies entrusted to Berkman by bcIMC;

b. By delivering to bcIMC financial compilations and reports for years (or periods within) 1998, 1999, 2000 and 2001 prepared by Geffen Mesher and Arthur Andersen, as the case may be, containing materially inaccurate statements about the financial

Page 45– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

condition of Funds I and II;

    c.    By making inaccurate statements to bcIMC in 2002 and 2003, and in response to direct inquiries by bcIMC, about the status of the Geffen Mesher audit review, the concerns Geffen Mesher and Hawkins had raised to Berkman in connection with the audit review, and the reasons Geffen Mesher and Hawkins terminated their work on the audits;

    d.    By making inaccurate statements to, and withholding material facts from, bcIMC relating to instances where Berkman and entities he controlled took Fund money or used Fund money for unauthorized purposes;

    e.    By using improper accounting methods to misrepresent the true financial condition of Funds I and II;

    f.    By failing to disclose material facts related to transactions involving Funds IV and V;

    g.    By failing to disclose material facts related to "in-kind" loan repayments;

    h.    By failing to disclose material facts related to unsecured and undocumented loans involving Funds I and II; and

    i.    By providing inaccurate information to bcIMC about the reasons for losses suffered by Funds I and II;

148.

In light of Berkman's general reputation in the venture capital community and the manner in which he held himself out to bcIMC, bcIMC had a right to rely on, and did rely on, all representations of Berkman, SVM I, SVM II and CB&A in connection with Berkman's management and operation of the Funds.

149.

None of the acts or omissions set forth in the preceding paragraphs were known by bcIMC, nor could reasonably have been discovered by bcIMC, more than two years before Berkman signed an agreement tolling the statute of limitations in March 2005.

Page 46– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

150.

As a direct result of the actions of Berkman, bcIMC has sustained damages as stated below.

### TENTH CLAIM FOR RELIEF

**(Restatement (Second) of Torts Sec. 876—The Funds and members v. Arthur Andersen and Richard Hawkins)**

151.

The Funds and members reallege the preceding allegations.

152.

As described above, Berkman committed the following tortious acts against the Funds and their members:

a.     Misrepresented to the Funds' members the true nature of the transactions in which the Funds were involved;

b.     Converted money belonging to the Funds;

c.     Breached fiduciary duties owed to the Funds and members in his capacity as manager of the Funds by acting in his own interest as opposed to the Funds' interest, by failing to make full and fair disclosure to the Funds and their members the true nature of transactions, and by failing to act with due care.

153.

At the time Berkman began managing the Funds, he had significant, preexisting obligations to repay holders of convertible promissory notes that he had issued either personally or through CB&A. These obligations exceeded $3.76 million in 1997 and 1998.

154.

Arthur Andersen provided professional services to the Funds and their members beginning in 1999, pursuant to the terms of agreements Berkman signed on behalf of the Funds. These services included the preparation of compilation reports and financial

Page 47– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1 | statements, the preparation of tax returns, and other accounting services that were in the form
2 | of bookkeeping services. Hawkins was the lead Arthur Andersen partner and worked
3 | directly with Berkman.

4

### 155.

5 | Hawkins and Arthur Andersen were aware of Berkman's activities prior to the
6 | formation of the Funds as Hawkins and Arthur Andersen provided professional accounting
7 | services to entities with which Berkman invested or purported to invest Fund assets. These
8 | entities include: Cascade Ventures, GeoTrust, WellPartner, Preview Systems, SuperTracks,
9 | PuriPonics, LLC, EVI, Inc, APN and Oxibio.

10

### 156.

11 | By December 31, 1998, Berkman had successfully solicited investments from
12 | members of Fund I in the amount of $6,648,195. As of that date, Berkman had transferred
13 | $1,862,300 of Fund I investor contributions to CB&A in order to repay his preexisting debt.
14 | The accounting records for Fund I reported that $1,862,300 was placed in an "Investment
15 | Account." During 1998, CB&A transferred $1,665,832 of Fund I's money to Berkman.

16

### 157.

17 | Arthur Andersen reviewed the $1,862,300 "Investment Account" created by Berkman
18 | and renamed the account as "Cash – CB & Associates" and reclassified the $1,862,300 as
19 | cash in the Fund's financial records. Arthur Andersen's records show that it had no
20 | documentation substantiating the existence of the "Cash – CB & Associates" account at the
21 | time it made that reclassification. The reclassified "Cash – CB & Associates" account was
22 | the single largest cash account listed on the financial statements Arthur Andersen prepared
23 | for Fund I.

24

### 158.

25 | The 1998 year-end compilation report issued by Arthur Andersen reported on Fund
26 | I's balance sheet that the Fund had $2,816,763 in "Cash or Cash Equivalents." That account

Page 48– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

161.

Arthur Andersen's 1999 year-end compilation report and financial statements for Fund I did not disclose the $1,862,300 CB&A had taken from Fund I in 1998 and "repaid" with Fund III's money in 1999.

162.

On April 25, 2000, in connection with Arthur Andersen's preparation of a compilation report and financial statements for the Funds for the year ending December 31, 1999, Arthur Andersen wrote Berkman—in his capacity as the Funds' manager—a letter with a three page list of "open items." Arthur Andersen asked for documentation to support various transactions for the Funds. Of the open items, 23 were related to payments by Fund III to CB&A for the purchase of $5,739,250 of Preview Systems stock. Arthur Andersen requested stock certificates for these transactions. When Arthur Andersen received Berkman's signed verification that the transactions were "correctly stated in the December 31, 1999, compilations" and reports Arthur Andersen sent to the Funds' members, it chose to rely on Berkman's representation that he in fact made the Preview Systems stock purchases. Arthur Andersen agreed to follow up on the open items until they were resolved.

163.

Arthur Andersen's letter also listed as an open item, "[Promissory] notes need to be written for the cash transfers between CB Capital I, II, II-A [the Funds] and CB & Associates [CB&A]."

164.

Arthur Andersen issued an interim compilation report for Fund II as of June 30, 2000, which listed a "SHORT TERM NOTE RECEIVABLE" in the amount of $6,569,861 as an asset on the balance sheet. In fact, this was not a short-term note receivable, but was instead money that Berkman had taken from Fund II as of June 30, 2000. Berkman and Arthur Andersen failed to disclose that Berkman owed the "Receivable" to the Funds and that it was

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1 | included the $1,862,300 Berkman had transferred to CB&A. The Arthur Andersen
2 | compilation report did not disclose the transfer of $1,862,300 from Fund I to CB&A.
3 | Berkman, Hawkins, and Arthur Andersen concealed or did not disclose the lack of
4 | documentary support for the "Cash – CB & Associates" account.

5 | 159.

6 | As of December 31, 1999, Berkman transferred $5,739,250 belonging to Fund III to
7 | CB&A purportedly from the purchase of Preview Systems stock. On the same dates and in
8 | the exact amounts as Berkman transferred $1,862,300 from Fund III to CB&A, CB&A
9 | transferred $1,862,300 to Fund I to replace the money that CB&A had previously taken from
10 | Fund I. Arthur Andersen was aware of these transactions. These transfers were concealed
11 | from the Fund members. Neither Berkman nor Arthur Andersen disclosed to the Funds'
12 | members the fact that Berkman was using money from Fund III to repay Fund I.

13 | 160.

14 | In Arthur Andersen's 1999 year-end compilation report and financial statements for
15 | Fund III, "Investments" were reported as being $14,019,478. This included a representation
16 | that $5,739,250 was invested in Preview Systems. Berkman failed to disclose the fact that as
17 | of December 31, 1999, he had invested only $2,140,875 in Preview Systems. The financial
18 | statements thus overstated the "Investments Account" Fund III by $3,598,375. Arthur
19 | Andersen knew and failed to disclose to the Fund's members that there was no
20 | documentation supporting Berkman's claimed purchase of Preview Systems stock. Berkman
21 | failed to disclose the overstatement and refused to disclose internal memoranda documenting
22 | the overstatement until 2005. Arthur Andersen refused to disclose memoranda documenting
23 | the overstatement and its knowledge of the lack of supporting documentation until it was
24 | served with the Complaint in this lawsuit. The Fund III investment overstatement concealed
25 | Berkman's use of Fund III money along with his misappropriation of $1,862,300 from Fund
26 | I in 1998.

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1 | not supported by a promissory note or other documentation.

2 | 165.

3 | In March 2001, when Arthur Andersen was preparing its compilation report and
4 | financial statements for the Funds for the year ending December 31, 2000, Arthur Andersen
5 | received a memo from Berkman's bookkeeper and former Arthur Andersen employee,
6 | advising that $7,863,250 had been transferred to CB&A for the purchase of Preview Systems
7 | stock—but that only $4,396,175 had used by CB&A to buy that stock and the remaining
8 | $3,467,075 had been kept by CB&A. The memo stated "those funds were treated as loans to
9 | CB&A in [Fund II's] books after the transfer of the [Preview Systems] investment to the
10 | latter fund." Berkman and Arthur Andersen failed and/or refused to disclose the memo and
11 | information in it until 2005 (Berkman) and 2006 (Arthur Andersen).

12 | 166.

13 | Accompanying the memo to Arthur Andersen was a schedule of transfers of money to
14 | CB&A listed by date and amount. The schedule shows some purchases of Preview Systems
15 | stock as well as some money taken by CB&A as a "loan." The schedule shows that most of
16 | the purchases that Arthur Andersen listed as "open items" in their letter of April 25, 2000—
17 | which Berkman confirmed were actual purchases made—were never made and that
18 | Berkman's written representation was inaccurate. Arthur Andersen and Hawkins knew at
19 | least by March 2001 that Berkman misrepresented to Arthur Andersen and misrepresented
20 | the Preview Systems transactions in the Funds' books and records. Arthur Andersen and
21 | Hawkins also knew at that time that the financial statements and compilation reports Arthur
22 | Andersen prepared for the members were materially false.

23 | 167.

24 | On April 2, 2001, Berkman's bookkeeper sent another memo to Arthur Andersen.
25 | This memo disclosed to Arthur Andersen that Berkman had used membership units in Fund
26 | II to repay $1.375 million of preexisting debt owed by Berkman and/or CB&A to the holders

Page 51– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1 of convertible promissory notes. The memo disclosed that Berkman should have paid the
2 capital payments for those membership units and failed to make those payments. This
3 information was withheld from and wasn't disclosed to members by Berkman or Arthur
4 Andersen until 2005 and 2006, respectively.

5         168.

6     In one version of Fund II's year-end 2000 compilation report and financial statements
7 prepared by Arthur Andersen, it classified $5,130,194 taken by Berkman as a "NOTE
8 RECEIVABLE – RELATED PARTY, CRAIG BERKMAN & ASSOCIATES, INC." In
9 another version of the report, the same asset is described as a "SHORT TERM NOTE
10 RECEIVABLE."

11         169.

12     The year-end 2000 compilation report and financial statements prepared by Arthur
13 Andersen were addressed directly to the Funds' members. Arthur Andersen and Hawkins
14 were aware of the identity of each of the members of the Funds as Arthur Andersen and
15 Hawkins prepared K-1 tax return forms for each individual member. Arthur Andersen
16 delivered an original report for each member to Berkman for distribution.

17         170.

18     At the same time Arthur Andersen and Hawkins were providing professional services
19 to the Funds, Arthur Andersen was also providing professional accounting services,
20 including in some cases audit services, to a number of portfolio companies in which the
21 Funds invested. These companies include PuriPonics, in which the Funds invested
22 $5,601,125; EVI, in which the Funds invested $4,746,661; SuperTracks, in which the Funds
23 invested $6,048,700; Preview Systems, in which the Funds invested $8,954,779; and
24 GeoTrust, in which the Funds invested $6,342,861.

25        171.

26     At no time did Arthur Andersen or Hawkins communicate any of their findings

Page 52– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1 including errors and irregularities in the financial statements to the Funds' members. When

2 Arthur Andersen was providing professional services for the Funds, Arthur Andersen and

3 Hawkins were aware that Berkman had misrepresented to Fund III's members that

4 approximately $8 million had been invested in Preview Systems stock—when, in fact,

5 Berkman had misappropriated at least $3,467,075 of Fund III's money under the guise of

6 purchasing Preview Systems stock.

7                                                     172.

8      When Arthur Andersen and Hawkins provided professional services to the Funds,

9 they were aware that Berkman had misrepresented to the Funds' members that their money

10 had been invested in start-up companies when, in fact, the money had been misappropriated.

11                                                     173.

12      During the time Arthur Andersen and Hawkins provided professional services to the

13 Funds, they were aware that Berkman had breached fiduciary duties of loyalty and full

14 disclosure to the Funds and their members by using the Funds' money for his own interest as

15 opposed to the Funds', by misappropriating the Funds' money and by depriving the Funds of

16 the liquidity necessary to make follow-on investments to protect existing investments against

17 dilution.

18                                                     174.

19      At the time Arthur Andersen and Hawkins provided professional services, they were

20 aware that Berkman had breached fiduciary duties to the members by failing to make

21 disclosures about the true nature of transactions, including the approximately $2.1 million

22 taken from Fund I as of year-end 1998, failing to make the Preview Systems investments in

23 Fund III as of year-end 1999, stealing $3,467,075 from Fund II as of year-end 2000, and

24 failing to disclose to members that he had used membership units in the Funds to repay

25 $1,375,000 in personal debt. Arthur Andersen and Hawkins also knew—based on the

26 brokerage statements—that although Berkman represented in the Funds' books and records

Page 53– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1    that the Funds invested several million dollars in Preview Systems before its initial public

2    offering of stock, all but $200,000 of Fund assets actually invested in Preview Systems was

3    invested after Preview Systems went public.

4                            175.

5        Because of Hawkins's knowledge of Berkman's historical misconduct, he and Arthur

6    Andersen knew or should have known that they could not rely on Berkman's representations

7    when preparing the Funds' compiled financial statements without first obtaining additional

8    information and performing additional investigation. Under applicable public accounting

9    standards, Hawkins's and Arthur Andersen's awareness of Berkman's potential improper

10    acts created a duty for Hawkins and Arthur Andersen to conduct further investigation into

11    potential fraud, illegal acts, or inappropriate transactions involving Berkman in the course of

12    preparing compiled financial statements for the Funds and their members.

13                           176.

14        Berkman breached fiduciary duties to the Funds and their members by acting in his

15    own interest in that his investment activities were not designed to maximize the rate of return

16    on investments. Instead, his actions were designed to conceal the fact that he had taken

17    money belonging to the Funds for his own use from the start of his management of the

18    Funds. This resulted in Berkman often taking unreasonable risks in order to try to generate

19    profits sufficient to conceal his misconduct.

20                           177.

21        Berkman breached fiduciary duties to the Funds and their members by selling the

22    Funds' interests in securities he owned and from which he obtained an improper benefit. He

23    also breached fiduciary duties to the Funds and their members by engaging in transactions

24    between and among Funds I, II, III, IV, and V in order to conceal money taken and to

25    conceal other misconduct.

26                         **First Count**

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

**(Restatement Section 876(a)—Acting in Concert or Pursuant to a Common Design)**

178.

The Funds and members reallege the preceding allegations.

179.

Arthur Andersen and Hawkins are jointly and severally liable with Berkman for all damages arising out of his tortious conduct because they acted in concert with Berkman to accomplish a tortious result and/or pursuant to a common design.

180.

In particular, Arthur Andersen and Hawkins acted in concert with Berkman and/or pursuant to a common design:

a.      By reclassifying a Fund I "Investment Account" to an account titled "Cash – CB & Associates" and issuing a year-end 1998 report that misclassified money that had been transferred from Fund I to CB&A as "Cash or Cash Equivalents" on the balance sheet of Fund I. Arthur Andersen did this at a time when it knew through Hawkins and others that Berkman and/or CB&A had significant debt obligations. Arthur Andersen's reclassification of accounts and false compilation report concealed Berkman's improper transfer of money to CB&A.

b.      By failing to require supporting documentation from Berkman for $1.8 million "Investment Account" in Fund I for year-end 1998.

c.      By preparing a year-end 1999 compilation report and financial statement for Fund III that misrepresented that investments were made in Preview Systems before its initial public offering when Arthur Andersen knew that the money had instead been transferred to CB&A.

d.      By routing its compilation reports and financial statements through Berkman rather than providing them directly to the members of the Funds.

e.      By falsely reporting in June 2000 that Fund II had a "Short Term Note

Page 55– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1  Receivable" when in fact Arthur Andersen knew that Berkman had taken the money from
2  Fund II and had previously misrepresented it to be an investment in Preview Systems.

3       f.      By falsely reporting in its year-end 2000 compilation report and financial
4  statements that Berkman had taken a loan from Fund II when Arthur Andersen knew that
5  Berkman had misappropriated money belonging to Fund II.

6       g.      By failing to report Berkman's misconduct to investors so that Arthur
7  Andersen and Hawkins could continue working for, and earning fees from, the Funds and
8  other entities Berkman controlled.

9       h.      By failing to comply with appropriate and applicable accounting principles or
10 to meet professional standards in connection with the preparation of and reporting on
11 financial statements and other accounting services in its actions during the time frame it
12 rendered services, in that the financial statements did not fairly represent the Funds' financial
13 position or results of operations.

14      i.      By failing to investigate further when they knew that Berkman was engaged in
15 illegal acts, or inappropriate transactions, or other activities constituting fraud.

16      j.      By preparing compiled financial statements which omitted substantially all
17 disclosures, when they knew that such steps were undertaken to mislead those who might
18 reasonably be expected to use the financial statements.

19      k.      By reporting on compiled financial statements using an "other comprehensive
20 basis of accounting" ("OCBOA") as opposed to "generally accepted accounting practices"
21 ("GAAP") when OCBOA was inappropriate and misleading under the circumstances known
22 to them.

23      l.      By agreeing with Berkman in 1999 and 2000 not to perform the audits of
24 Funds I and II that bcIMC had requested.

25      m.      By failing to make additional inquiries and obtain additional or revised
26 information when they became aware that the information provided to them was incorrect,

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1      incomplete, or otherwise unsatisfactory.

2         n.      By failing to inform the appropriate level of Fund management (a level above

3      Berkman, i.e., advisory committee and members) regarding the material errors, or fraud, or

4      illegal acts that had come to their attention.

5                                          181.

6         By working with Berkman to conceal his misconduct, Arthur Andersen and Hawkins

7      took active steps in furtherance of their actual or implied agreement to cooperate with, aid,

8      and abet Berkman's misconduct. Arthur Andersen and Hawkins are therefore jointly liable

9      for all damages caused by Berkman's tortious conduct.

10                                     **Second Count**

11        **(Restatement Section 876(b)—Knowingly Providing Substantial Assistance)**

12                                          182.

13        The Funds and members reallege the preceding allegations.

14                                          183.

15         Arthur Andersen and Hawkins are jointly and severally liable with Berkman for all

16      damages arising out of his tortious conduct because they knowingly provided substantial

17      assistance to Berkman's tortious conduct.

18                                          184.

19         During the time it provided professional services for the Funds, Arthur Andersen and

20      Hawkins were aware that Berkman used the Funds' money for his own interest, converted

21      the Funds' money and deprived the Funds of the liquidity necessary to make follow-on

22      investments to protect existing investments against dilution. Arthur Andersen and Hawkins

23      also knew that Berkman failed to make disclosures about the true nature of transactions,

24      including the approximately $2.1 million taken from Fund I as of year-end 1998, the failure

25      to make $3,598,375 of Preview Systems investments in Fund III as of year-end 1999, the

26      misappropriation of $5,130,194 taken from Fund II as of year-end 2000, and the failure to

Page 57– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1  disclose to investor members that Berkman had used Fund II membership units to repay
2  $1.375 million in personal debt.  Arthur Andersen and Hawkins, therefore, had actual
3  knowledge of Berkman's tortious conduct during the time it provided professional services
4  for the Funds and members.

5  185.

6  During the time Arthur Andersen and Hawkins provided professional services to the
7  Funds and members, they were aware that Berkman was engaged in tortious conduct.  This
8  knowledge is demonstrated by the following facts they learned during that time:

9  a.  Arthur Andersen and Hawkins knew that Berkman misrepresented the
10  approximately $2.1 million taken from Fund I in 1998 as an "Investment Account."  Arthur
11  Andersen and Hawkins provided substantial assistance to Berkman by reclassifying the
12  account to "Cash -- CB & Associates" and by preparing financial statements and a year-end
13  1999 Compilation Report characterizing this asset as "Cash or Cash Equivalent" when they
14  knew it was money Berkman had taken for his own use.

15  b.  Arthur Andersen and Hawkins knew that by year-end 1999 Berkman had
16  taken $5,739,250 from Fund III and claimed to have invested in Preview Systems stock prior
17  to its IPO.  Arthur Andersen and Hawkins knew that Berkman had in fact used $1,862,300
18  taken from Fund III to replace the money he had taken in 1998 from Fund I.  Arthur
19  Andersen provided Berkman substantial assistance in connection with his tortious conduct,
20  including misrepresentation, conversion, and breach of fiduciary duty by issuing financial
21  statements and compilation reports for Fund III for year-end 1999 that did not accurately
22  reflect the financial condition of the Fund as it overstated investments by $3,598,375, and it
23  failed to properly classify the money taken by Berkman.  Substantial assistance was also
24  provided by Arthur Andersen and Hawkins's failure to withdraw and reissue the 1998 Fund I
25  compilation report and financial statements to reflect the approximately $2.1 million that
26  Berkman had taken as of year-end 1998.

Page 58–  THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

866 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1    c.    Arthur Andersen and Hawkins knew at the time they issued their June 30,

2  2000, compilation report and financial statements for Fund II that Berkman had taken

3  $6,569,861 from Fund II for his own use. Arthur Andersen and Hawkins provided

4  substantial assistance to Berkman by reporting that Fund II had a "Short Term Note

5  Receivable" in the amount of $6,569,861 when they knew that he had taken the money.

6    d.    Arthur Andersen and Hawkins knew that Berkman had committed torts during

7  the year 2000 as they were told by his in-house accountant that he had transferred money to

8  CB&A for the purported purpose of purchasing Preview Systems stock, but that he did not

9  use the money for that purpose. They knew from the March 10, 2001, memo and its

10  schedule of Preview Systems purchases that Berkman had made misrepresentations to them

11  in April 2000 when he confirmed the Preview Systems investments were made. Arthur

12  Andersen provided Berkman substantial assistance in committing tortious acts including

13  conversion and breach of fiduciary duty by reporting in the year-end 2000 compilation report

14  and financial statements for Fund II that Berkman had borrowed $5,130,194 when they knew

15  the money had been taken. They assisted by reclassifying Berkman's misappropriation as a

16  "loan" to him and reported on the financial statements as such. They also assisted by failing

17  to withdraw and reissue the year-end 1999 report for Fund III to accurately reflect the fact

18  that Preview Systems investments in the amount of $3,598,375 were in fact not made.

19    e.    By March 2001, at the latest, Andersen knew that Berkman had

20  misrepresented the purchase of Preview Systems stock when he signed Andersen's

21  confirmation letter of April 2000. They knew this because of the March 2001 memo from

22  the Funds' bookkeeper. They also knew this because they were the auditors for Preview

23  Systems in 1998-2000 and accountants in 2001.

24    f.    Arthur Andersen and Hawkins knew in April 2001, that Berkman had

25  breached his fiduciary duty to the Funds when it received a memo from his in-house

26  accountant disclosing that Berkman had issued $1.375 million in membership units in Fund

Page 59– THIRD AMENDED COMPLAINT

1   II to repay personal debt. Arthur Andersen and Hawkins gave Berkman substantial

2   assistance by reporting that Fund II had "Member Equity" in the amount of $45,693,887

3   when it did not.

4                              186.

5      In addition to the specific acts alleged in the preceding paragraph, Arthur Andersen

6   and Hawkins provided substantial assistance to Berkman's tortious conduct in a number of

7   other ways, including:

8      a.     By issuing a year-end 1998 report that misclassified money that had been

9   transferred from Fund I to CB&A as "Cash or Cash Equivalents" on the balance sheet of

10   Fund I. Arthur Andersen did this at a time when it and Hawkins knew that Berkman had

11   significant debt obligations. Arthur Andersen's false compilation report concealed

12   Berkman's improper transfer of money to CB&A.

13      b.     By preparing and issuing a year-end 1999 compilation report and financial

14   statement for Fund III that misrepresented that investments were made in Preview Systems

15   when Arthur Andersen knew that the money had instead been transferred to CB&A.

16      c.     By agreeing with Berkman in 1999 not to perform the audits of Funds I and II

17   that bcIMC had requested.

18      d.     By routing its compilation reports and financial statements through Berkman

19   rather than providing them directly to the members of the Funds.

20      e.     By falsely reporting in June 2000 that Fund II had a "short term note

21   receivable" when in fact Arthur Andersen knew that Berkman had taken the money from

22   Fund II and misrepresented it to be an investment in Preview Systems.

23      f.     By falsely reporting in its year-end 2000 compilation report and financial

24   statements that Berkman had taken a "loan" from Fund II when Arthur Andersen knew that

25   he had misappropriated money belonging to Fund II.

26      g.     By failing to report Berkman's misconduct to the Funds' members in order to

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1 | continue working for, and earning fees from, other entities Berkman controlled.

2 |       h.     By failing to comply with appropriate and applicable accounting principles or
3 | to meet professional standards in connection with the preparation of and reporting on
4 | financial statements and in its actions during the time frame it rendered services, in that the
5 | financial statements did not fairly represent the Funds' financial position or results of
6 | operations.

7 |       i.      By failing to investigate further when they knew that Berkman was engaged in
8 | illegal acts, or inappropriate transactions, or other activities constituting fraud.

9 |       j.      By reporting on complied financial statements which omitted substantially all
10 | disclosures, when it knew or should have known that such steps were undertaken to mislead
11 | those who might reasonably be expected to use such financial statements.

12 |       k.     By failing to inform the appropriate level of Fund management (a level above
13 | Berkman) regarding the material errors, or fraud, or illegal acts that had come to its attention.

14 |       l.      By failing to make disclosures to the Funds and/or its members of accounting
15 | errors, misstatements and/or misrepresentations made by Berkman to the Funds and/or its
16 | members which Andersen was aware of through services provided to Fund portfolio
17 | companies, including Cascade Ventures, SuperTracks, GeoTrust, APN, WellPartner, EVI,
18 | PuriPonics, Oxibio and Preview Systems.

19 | 187.

20 |      Because Arthur Andersen provided substantial assistance to Berkman's tortious
21 | conduct (as described above), Arthur Andersen is jointly liable for all damages caused by his
22 | tortious conduct for which Arthur Andersen provided substantial assistance.

23 | **Third Count**

24 | **(Restatement Section 876(c)—Substantial Assistance/Breach of Duty)**

25 | 188.

26 |      The Funds and members reallege the preceding allegations.

Page 61– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

1       189.

2       Arthur Andersen and Hawkins are jointly and severally liable with Berkman for all

3   damages arising out of his tortious conduct because they provided substantial assistance to

4   his tortious conduct while breaching duties they owed the Funds and members.

5       190.

6       Arthur Andersen and Hawkins breached duties owed to the Funds and members by

7   failing to meet obligations owed under its engagement letters, comply with appropriate

8   accounting principles, and/or meet professional standards in preparing and reporting the

9   Funds' financial statements. In so doing, Arthur Andersen and Hawkins failed to meet the

10  standard set forth in The American Institute of Certified Public Accountants ("AICPA")

11  Statements on Accounting and Review Services; the AICPA Code of Professional Conduct;

12  the AICPA Bylaws; and the AICPA Statements on Quality Control Standards. Arthur

13  Andersen and Hawkins breached these and other professional standards in a number of ways,

14  including:

15      a.      By failing to maintain total independence of professional judgment.

16      b.      Knowingly issuing financial statements that did not fairly represent the Funds'

17  financial position or results of operations.

18      c.      By failing to investigate further when they knew that Berkman was engaged in

19  illegal acts, or inappropriate transactions, or other activities constituting fraud.

20      d.      By reporting on complied financial statements which omitted substantially all

21  disclosures, when it knew or should have known that such steps were undertaken to mislead

22  those who might reasonably be expected to use such financial statements.

23      e.      By reporting on compiled financial statements using an "other comprehensive

24  basis of accounting" ("OCBOA") as opposed to "generally accepted accounting practices"

25  ("GAAP") when OCBOA was inappropriate and misleading.

26      f.      By failing to make additional inquiries and obtain additional or revised

Page 62– THIRD AMENDED COMPLAINT

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-7089
Telephone. 503.228.6351
Facsimile 503.295.0915